No. 25-02876

--------------------------------------------------------------------------

Seventh Circuit Court Of Appeals

--------------------------------------------------------------------------

UNITED STATES OF AMERICA,

*Plaintiff-Respondant*

U.S.C.A. – 7th Circuit
R E C E I V E D

DEC 18 2025

vs.

Tim Fredrickson

*Defendant-Appellant*

--------------------------------------------------------------------------

On Appeal From the Central District of Illinois

Hon. Michael Mihm

No. 14-cr-40032

--------------------------------------------------------------------------

**Opening Brief**

# Questions Presented

Whether the District Court committed a clear error of fact and law by concluding that the Bureau of Prisons could "adequately mitigate" the risk of contagious disease, despite the undisputed fact that the Defendant contracted Tuberculosis while in the BOP's custody, and the BOP's own protocol involves inadequate year-long testing delays, and that when testing takes place it is done improperly in a way that voids the test.

Whether the District Court committed a legal error and an abuse of discretion by placing dispositive weight on the pre-existing 18 U.S.C. §3553(a) factors *as they existed at the time of sentencing* to negate newly discovered, life-threatening medical conditions, rather than considering that and the fundamentally and irrevocably *changed circumstances* of incarceration as they exist today[1].

---

1   Which is to say they are both fluid and cumulative, not static and isolated. The sentencing factors transcend the procedural vehicle used to examine them, and are not frozen in time at the filing of the latest motion.

# Table of Contents

Questions Presented................................................................................2

Table Of Authorities..............................................................................3

I. Introduction And Statement Of The Case..............................................4

II. The District Court Erred In Rejecting "Extraordinary And Compelling Reasons"...........4

  A. The Facility Is "Affected" by an Ongoing Outbreak............................4

  B. The Defendant Is at Increased Risk of Severe Medical Complications............6

  C. The Risk Cannot Be Adequately Mitigated in a Timely Manner..............7

III. The Sentencing Factors - Rebalancing 18 U.S.C. §3553(a) Against the Realities of Incarceration...........9

  A. The Fictional Baseline: The Fallacy of the Perfect Carceral Environment at Sentencing............10

  B. The Inability to Pre-judge Operational Failure............................11

  C. Empirical Evidence of Unjust Sentence Execution............................12

  D. Diminished Deterrence and Respect for Law §3553(a)(2)(A)-(B)............16

  E. Erosion of the Mandate for Correctional Treatment §3553(a)(2)(D)............17

IV. The De Minimis Threshold: The Judicial Duty to Correct Even Minor Imbalances...........17

V. Conclusion...........................................................................19

# Table Of Authorities

United States Sentencing Guideline §1B1.13(b)(1)(D)...........................3, 4, 7, 11

Title 18 United States Code §3582(c)(1)(A)(i)..........................3, 4, 7, 8, 10, 17

Title 18 United States Code §3553(a)...................3, 4, 9, 10, 12, 16, 17, 18, 19

**Related cases**

The initial motion for compassionate release was filed in the district court on 1/18/2022 as Dkt #203, The issue was appealed under No. 22-01542

The second motion for compassionate release was filed in the district court on 6/27/2022 as Dkt #224, The issue was appealed under No.

The current motion for compassionate release was filed in the district court on 6/09/2025 as Dkt #319

# Appendix

Motion For Reduction of Sentence [Dkt 319]...........................................1-6

Government's Response [Dkt 321]....................................................7-28

Fredrickson's Reply [Dkt 324].....................................................29-36

District Order [Dkt 325]..........................................................37-43

Notice of Appeal [Dkt 326].............................................................

# I. Introduction And Statement Of The Case

Appellant Fredrickson appeals the District Court's October 1, 2025 Order and Opinion (Dkt. #325), which denied his Motion for Compassionate Release under 18 U.S.C. §3582(c)(1)(A)(i). The District Court committed clear legal error by concluding that the sentencing factors under 18 U.S.C. §3553(a) are static and weigh uniformly against a sentence reduction, thereby failing to recognize that the actual severity of the sentence has been fundamentally and irrevocably enhanced by the systemic failures of the Bureau of Prisons, the acquisition of life-threatening medical vulnerabilities in custody, and the realities of American incarceration in practice. It also made a plainly erroneous *factual* finding that FCI Seagoville has *never* been affected by Tuberculosis despite both Fredrickson's own medically verified infection of the contagious disease at the facility and the complete lack of contact tracing.

The denial rests upon two flawed premises: (1) a narrow, medically unsound rejection of "extraordinary and compelling reasons" under USSG §1B1.13(b)(1)(D); and (2) a complete disregard for the dynamically fluid and cumulative nature of the ever-changing §3553(a) factors.

This appeal contends that the §3553(a) factors must now favor a sentence reduction to restore judicial proportionality, as the operational reality of the BOP has transformed Fredrickson's judicially authorized term of 200 months into a punitive experience that is "greater than necessary".

## II. The District Court Erred In Rejecting "Extraordinary And Compelling Reasons"

The District Court gave a medical opinion which it is not qualified to make and outside of the judicial ken. It also misapplied USSG §1B1.13(b)(1)(D) by employing an unduly restrictive interpretation of three elements for reduction based on infectious disease, thereby dismissing Fredrickson's unique compounding vulnerabilities.

## A. The Facility Is "Affected" by an Ongoing Outbreak

The District Court erred in finding that FCI Seagoville was *never* "affected", and *currently* is not, because Fredrickson's diagnosis was for *latent* tuberculosis (TB), which it stated "*cannot* be spread to others". *Order #325 @4* (emphasis added). This is a failure to consider the evidence:

**Proof of Institutional Failure:**

Fredrickson, confined for years, contracted a *new TB infection in custody*. This fact is irrefutable evidence that the facility was affected by a transmissible, ongoing outbreak, regardless of whether *this* infection later became latent. The source of the disease was "the only place he has been in the last several years --the BOP". *Motion #319 @2*. The government does not provide *any* evidence that FCI Seagoville is not effected. At best it merely implies the court should infer Fredrickson's now latent infection is representative of the entire facility[2]. Fredrickson provided proof it is present, the government offered no evidence at all that it is absent.

**Mitigation Failure:**

The Court ignores that the BOP's standard testing protocol is unreliable and, in this case, failed to prevent the infection of patient zero, who later infected Fredrickson and unquestionably others. Furthermore, the facility failed to do any kind of contact tracing after its detection, demonstrating a profound failure to curtail spread. Fredrickson's infection is proof of the failure to mitigate spread, and the failure to even attempt contact tracing is damning. The government offers supposition instead of evidence[3]. It *assumes* successful treatment, despite no followup testing for resistant strains, and has given no evidence whatsoever for its bold statement that Fredrickson "shows no signs of active infection" following the prescribed regiment. *Gov't Resp #321 @17*.

**District Court's Medical Opinion:**

The conclusion that latent TB "cannot" spread is both misdirection and improper expert medical opinion. Fredrickson's personal active/latent distinction is irrelevant to whether the facility is or was "affected", and is at most a difference of *degree* of risk, not *absence* of risk. Similarly, the conclusion that latent TB *cannot* be spread is an improper (and wrong) expert medical opinion that equates a *reduced likelihood* of spread with *absolute impossibility* of further spread. It also ignores the fact latent TB can become active TB at any time. Furthermore, there is no evidence upon which to find that Fredrickson is cured while simultaneously ignoring the reality of drug-resistant strains which were never tested for despite asking the BOP to so test to protect health.

---

2  See Govt Dist Response #321 @12. ("Since latent tuberculosis cannot be spread to others, its presence in the defendant in March of 2025, which has since been treated, is not evidence that FCI Seagoville is affected")

3  See Govt Dist Response #321 @17 "he has already undergone a course of treatment for latent tuberculosis and shows no signs of active infection"

## B. The Defendant Is at Increased Risk of Severe Medical Complications

The Court dismissed the claim of heightened risk, stating Fredrickson's lungs were "clear" based solely on a misnomer --that the lungs were clear *of an active infection*... as opposed to healthy and undamaged. Furthermore the court improperly relied on an unsupported assumption that the latent TB infection was both completely eliminated and that it was not a resistant strain. There is no evidence of either purported fact, and the case should be remanded for this reason alone to find such purported facts. Based on this unsupported conclusory finding, the district court found that TB posed no threat. This a finding that is not only incorrect, but medically unsound, ignoring the *synergistic effect* of his acquired conditions. *Order #325 @3:*

## The Compounding Trifecta:

Fredrickson has been infected with both COVID-19 and TB, and he faces the imminent risk of highly contagious Measles. Medical research confirms that COVID-19 infections cause an immuno-suppressive state that depletes the T-cells "that are critical for walling off latent TB bacteria [] fighting to become an 'active' infection", making the latent but not quite "dormant" TB bacteria an "opportunistic pathogen". *Reply 324 @3.* Similarly, COVID aside, this latent TB ticking time bomb has *another* fuse --TB is vulnerable to reactivation by subsequent illnesses like Measles or the flu. A trifecta of respiratory diseases.

## Long-Term Catastrophe:

Measles is a respiratory disease, and contracting it would inflict "further damage to Fredrickson's lungs" *Motion 319 @4.* Fredrickson cited COVID[4] and TB[5] as the first and second source of damage. The Government's response was that there was no damage, which is actually a medical opinion cleverly cloaked with misdirection. The government suggests that an X-Ray[6] performed for the *limited* purpose of detecting active TB, and likewise read for that *limited* purpose, is somehow also a full and exhaustive medical suite reflecting a clean bill of health. Fredrickson had covid, has long covid, and now suffers complications of TB. With Measles lurking around the corner; The combination of prior respiratory damage and the threat of Measels constitutes a unique and compelling risk of "severe medical complications".

---

4  See Reply 324 @4 citing a source for the observation that "The incidence of post-COVID pulmonary fibrosis has been reported to range from 20% to 70% in survivors"

5  In response to TB, the body forms "Granuloma" nodules in the lungs, which house the TB. See **Exhibit A** Noori M, Younes I, Latif A, et al. (March 23, 2022) Reactivation of Tuberculosis in the Setting of COVID-19 Infection. Cureus 14(3): e23417. DOI

6  An X-ray that it has not introduced into the record, or produced so that it could be independently analyzed by an expert

## C. The Risk Cannot Be Adequately Mitigated in a Timely Manner

The Court relied on the availability of treatment in the case of Tuberculosis, and extending COVID case law regarding availability of a vaccine in the case of Measles, to avoid an inquiry into, and eliminate the relevance of, systemic inadequacy and subsequent risk. This misses the point entirely:

### Statutory Relief:

The risk is not merely catching a disease, it is the *complications* that follow catching a *third* disease (Measels) or the reactivation/reinfection of Tuberculosis a *second* time. The statute is intended for circumstances where the "increased risk of suffering severe medical complications ••• cannot be adequately mitigated in a timely manner", USSG §1B1.13(b)(1)(D), making it appropriate to address those concerns by "impos[ing] a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment" 18 USC §3582(c)(1)(A), which would allow Fredrickson to socially distance and evade two diseases (or more precisely, decrease the "increased risk" that "severe medical complications" could follow).

### Systemic Inadequacy:

The very fact that Fredrickson contracted TB **despite** the BOP's existence of "standard protocols", proves that the risk *cannot* be adequately mitigated within the correctional environment. The BOP's failure to prevent the initial infection, and further prevent *Fredrickson's* infection, means the facility did not and cannot provide a safe environment.

The first line of defense --detection-- is defunct. The BOP's preferred method of testing by injection of the Purified Protein Derivative is ineffectual for many reasons. First it is administered at an incorrect angle and too deep into subcutaneous tissue. As a result, any bodily reaction is impossible to see. This absence is incorrectly interpreted as TB negative. Second, even when administered correctly, the BOP's own internal guidance[7] recognizes that yearly testing causes the "booster phenomenon" where the body recognizes TB test particles and reacts in the same way it would a legitimate TB infection --a false positive. The BOP's preferred method of detection is doomed for failure, as was borne out in Fredrickson's case here, where the infection was only identified by a standard but not routine blood test.

---

7  Tuberculosis Federal Bureau Of Prisons Clinical Guidance February 2020

The second line of defense is contact tracing and treatment. The BOP has *never* attempted contact tracing, which *alone* is fatal to the concept of mitigation --it powerfully demonstrates that the BOP doesn't even *try* to mitigate spread of infectious disease. Underscoring this failure, is that known infected citizens like Fredrickson are presumed not to have a strain resistant to antibiotics, and are presumed to be cured by standard antibiotics without any verification --which *causes the very conditions* that create and strengthen drug-resistant strains which also in turn increase the risk of complications.


**Ignoring Complications:**

The AUSA focuses on risk of *death* by citing two statistics that internally conflict. For example, it cites data "showing 9,633 reported cases, 565 deaths" which reduces to appx 5 deaths for every 96 cases, but then cites "a mortality rate of 0.2 per 100,000" which reduces to appx 1 death in 500,000 cases[8] of TB. *Gov't Resp #321 @15*.


The government also denies lung damage categorically. This is a non-starter. The government cannot withhold the very tests that would damn it and then say there is no evidence[6]. id @ 15-16. You don't find what you don't look for. It also cannot ignore that lung damage occurs from respiratory diseases like COVID, Tuberculosis, and Measles. It defies common sense, well-established medical findings, and is also a medical expert opinion that it is not qualified to make.


Shifting to Measles only, the government opined Fredrickson "very likely already enjoys immunity from contracting measles" via a vaccination without providing any proof of such. id @ 16-17. The District Court adopted all of this wholesale. *Order #325 @6*, noting that alternatively a vaccine is *possible* without a finding that it is *actually available*, further glossing over Fredrickson's well-established religious objection were it available --which would render it "unavailable". At bottom, it is all an effort at misdirection stating Fredrickson has two paths for "relief": injection without court involvement, or the statutory relief §3582 provides. The court cannot override and ignore the statute by pointing to relief purportedly available outside of the court.

---

8   565 over 9633  with rounding reduces to 56/963, then finally 5/96      while .2 over 100,000 multiplied by 10 to get a whole number
    is 2 / 1,000,000 which then reduces to 1 death in 500,000 cases.  This is an enormous unexplained discrepancy

### III. The Sentencing Factors - Rebalancing 18 U.S.C. §3553(a) Against the Realities of Incarceration

The central proposition of this analysis is that, given the systemic, documented, and inherent failures of the Federal Bureau of Prisons (BOP), the actual quantum of punishment experienced by an incarcerated individual invariably exceeds the quantum authorized by the sentencing court. This disparity arises from the fact that BOP's operational reality imposes hardships, violence, and neglect that constitute *unjust punishment*. As the term progresses, this accumulation of unmandated severity renders the sentence *greater than necessary* as a matter of law. In so many words, *incarceration* is the punishment, one is not incarcerated to *be* punished, it is only the *incarceration itself* which is authorized.

An original sentence is imposed based on the unavoidable fiction that the BOP will execute the sentence in an ideal, constitutional environment, providing safety, timely medical care, and humane conditions. Even under ideal conditions there will be differences in confinement which render one sentence more severe than another. It bears repeating that *incarceration* is the punishment, prisoners are not there to *be* punished. The sentencing judge legally cannot, and ethically should not, predict or incorporate into the calculation the logical certainty of future systemic failure. It is this unavoidable discrepancy that creates an inherent and automatic shift in the judicial balance of the §3553(a) factors over time, a shift that *must* favor a reduction in sentence to restore judicial proportionality and integrity. The gatekeeper is the "extraordinary and compelling" reason.

These unauthorized harms constitute *unjust* punishment, retroactively enhancing the sentence beyond the court's original intent. Perhaps the single most powerful demonstration of this concept *here*, is that judge Mihm could not foresee (and did not authorize) the BOP to infect Fredrickson with Tuberculosis.

When the conditions of confinement retroactively negate the implicit assumptions of safety, care, and constitutional adherence upon which the original sentence was based, the penological factors, particularly the need for "just punishment" and "correctional treatment", become applicable with new and compelling force. The judiciary cannot stand by and permit the executive branch's operational failures result in an unauthorized sentence enhancement.

## A. The Fictional Baseline: The Fallacy of the Perfect Carceral Environment at Sentencing

At the commencement of sentencing, a court necessarily assumes a foundational, but fictional, environment in which the sentence will be served. The judicial calculation of "just punishment"[9] --the measure of retribution deemed necessary-- is necessarily predicated on the presumption that the Bureau of Prisons will operate the facility in full compliance with 1) all Constitutional guarantees to the maximum extent that they are not incompatible with incarceration; and 2) the statutory mandate to provide "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner". §3553(a)(2)(D).

The court's original decision to impose a 16 year sentence --due to mitigating factors like lack of criminal history and a victim above the age of consent[10]-- is a determination that this specific 200 month duration is sufficient *under idealized conditions*. This sufficiency calculation implicitly assumes that the four purposes of sentencing (just punishment, deterrence, public protection, and treatment) will be met in an environment where Congress' directives and BOP policies are followed, and administrative functions are efficient and humane.

While the factors determining duration are static at the moment of judgment, the legislative framework for sentence modification under Title18 §3582(c)(1)(A) acknowledges that the punitive quantum is fundamentally dynamic. In other words, if they never change, then there is no reason for Congress to mention them, or a court to consider them. This statute grants the court authority to reduce a term of imprisonment upon finding "extraordinary and compelling reasons" and, critically, "after considering the factors set forth in section 3553(a) *to the extent that they are applicable*". id. Which is also a concession that they may infact not apply.

The fluidity of the §3553(a) factors is realized when the cumulative, unanticipated weight of confinement begins to transform the sentence's character. The sentence is rendered "greater than necessary" not due to changes in the defendant's offense (which remain static), but due to the degradation of the environment in which the sentence is executed --most recently the numerous direct and collateral effects of government shutdown.

---

9  §3553(a)(2)(A) "the need for the sentence imposed [] to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;"

10  Which is *sixteen* at the Federal level. See 18 USC §2243(a) (defining minor); See also §2241(c) (defining "child" as one under 12).

The language "to the extent that they are applicable" is not merely administrative; *If* applicable, it is also a mandatory temporal and conditional filter. It compels the sentencing court to perform a post-judgment assessment, recognizing that intervening facts and the accumulated realities of confinement can fundamentally alter the proportionality and effectiveness of the original sentence. Often transforming the punishment of *incarceration* from a punishment that *was* "sufficient" to a punishment that is *now* "greater than necessary". The Sentencing Commission affirmed this dynamic view by noting that an extraordinary and compelling reason need not have been foreseen at the time of the initial sentencing to warrant a reduction[11]. Thus, the actual severity of the confinement, as experienced by the defendant, must be factored into the new calculation. Fredrickson's position is that it will almost always favor reduction, if even by one day. What prevents opening the floodgates for review is an "extraordinary and compelling reason".

## B. The Inability to Pre-judge Operational Failure

The sentencing judge legally cannot, and ethically should not, predict or incorporate into the sentence calculation the certainty of future systemic failure or institutional abuse. There is a presumption of conformity. The original sentence cannot factor in the probability of events such as prison gangs, verbal abuse from officers, misuse of authority, inmate on inmate violence, prison rape, unexpected lockdowns, race/hate crimes, and the radical variations in management quality between different wardens. These elements, which are symptomatic of a failing system, are definitionally elements of *unjust* punishment, exceeding the scope of the sentence authorized by the court.

The sentencing process functions, in effect, as a provisional compact: the defendant accepts the deprivation of liberty and related hardship[12] for a fixed term, provided the Executive Branch guarantees constitutional safety, timely access to care, and adherence to humane standards. When the Executive branch, through the BOP, breaches these fundamental guarantees, the punitive severity imposed upon the defendant increases. This increase is not judicially authorized, and it transforms incarceration from a judicially defined sentence into an executive-imposed

---

11 USSG §1B1.13(e)  Amendment 814
12 "related" meaning what *necessarily* and unavoidably accompanies incarceration. e.g. loss of job, loss of privacy, inability to travel, eat specific foods, eat at will, select the best health care provider or opt for alternative medicines

hardship, forcing the judiciary to retroactively re-negotiate the term to correct the imbalance and maintain judicial oversight and adherence to the sentencing factors. If the court assumes an environment that promotes "respect for the law", but the reality is dominated by rising allegations of employee misconduct, physical abuse, violence, abuse of power, and other systemic failings[13]; then the actual penal experience undermines the very foundation of the judgment.


## C. Empirical Evidence of Unjust Sentence Execution

The BOP's operational reality consistently fails to meet the constitutional and statutory mandate to provide *"just* punishment" and effective "correctional treatment". Every day spent enduring systemic failure --from prison violence to delayed medical care-- adds an unauthorized severity to the sentence, eroding, *changing*, the proportionality of the original judgment. This suffering, whether viewed in isolation or accumulation, creates an inherent and automatic shift in the §3553(a) balance, which *does* favor a reduction. The point being made here is that it is nearly impossible for the sentencing factors to favor an unchanged sentence. The following is a non-exhaustive list of specific, internally verified and empirical examples of *unjust* punishment commonly suffered by inmates, which were not, and could not have been, factored into anyone's sentence:          **Bold = internal page #**

| Category | Summary of Violation (Unjust Punishment Imposed by BOP Reality) | Source | Page |
|---|---|---|---|
| **I. Systemic Misconduct and Lack of Accountability** | The number of cases and complaints per year generally increased from 5,921 total cases and complaints reported in 2014 to 9,769 in 2024. An approximate average of 542 cases and 329 complaints per facility. | GAO 25-107339 Strategic Approach Needed to Prevent and Address Employee Misconduct | **27 28** |
| | As of February 2025, the BOP had a backlog of 12,153 employee misconduct cases awaiting investigation or discipline. 37% of open employee misconduct cases have been unresolved for 3 years or longer. | | 2 **30 36** |
| | 2,279 misconduct cases were awaiting disciplinary action as of September 2022. | OIG 23-065 Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues | 3, 22 |
| | | | |

13 Fredrickson expressly incorporated an analysis "of the sentencing factors set out in all earlier motions [#203] [#224] for relief under this statute". See Motion #319 footnote 3. A facility-specific catalog documenting mold, power outages, and numerous

| Category | Summary of Violation (Unjust Punishment Imposed by BOP Reality) | Source | Page |
|---|---|---|---|
| **I. Systemic Misconduct and Lack of Accountability** | Each year, the Federal Bureau of Prisons receives thousands of employee misconduct allegations—and allegations are on the rise. These range from minor issues like unexcused absences to major incidents like abuse. Criminal misconduct made up about 14% of allegations between 2014-2024. These included allegations of physical and sexual abuse. | GAO Allegations of Employee Misconduct in Federal Prisons Are on the Rise. What's Being Done About It. Sep 30 2025 | 1 |
| | Crime Immunity: Statements from compelled employee interviews, and results of those statements, may not be used against the employee in a later criminal prosecution, unless they knowingly and willingly lie | GAO 25-107339 Strategic Approach Needed to Prevent and Address Employee Misconduct | **16** |
| | Staff falsified records attesting to conducting SHU rounds and emergency counts (related to high-profile suicide, and indicative of typical practice). | OIG 24-041 Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions | **30** **70** |
| | BOP fails to inform incarcerated individuals how to report a broad range of misconduct, focusing only on sexual misconduct. | GAO 25-107339 Strategic Approach Needed to Prevent and Address Employee Misconduct | **19** **20** |
| | BOP is not routinely sharing and using employee feedback on misconduct training to improve its effectiveness. | | **21** |
| **II. Life-Threatening Risks and Medical Neglect** | 187 deaths by suicide occurred (2014-2021), with psychological staff reporting these could be prevented if protocols were followed and proper resources provided. | OIG 24-041 Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions | **11** **15** |
| | Staff failed to conduct required inmate rounds or counts in over a third of inmate suicides. | | **11** |
| | 70 deaths from drug overdose occurred (2014-2021) | | **55** |
| | BOP emergency response to nearly half of inmate deaths had significant shortcomings (lack of urgency/equipment). | | **3** **33** |
| | BOP healthcare capabilities are "strained" due to limited funds, inadequate staffing, and a large, aging inmate population. | RUTHERFORD v CARTER, Nos. 24-820, 24-860 Amicus Brief Aug 2025 | **8** **12-15** **6-9** |
| | 725 backlog of laboratory orders and 274 pending x-ray orders (FCI Sheridan), causing medical conditions to go undiagnosed. Indicative of National conditions. | OIG 24-070 Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan | **8** **25** |
| | 101 outside medical appointments were canceled (Jan-Nov 2023) because FCI Sheridan lacked escort staff. Indicative of National conditions. | | **8** **25** |

| Category | Summary of Violation (Unjust Punishment Imposed by BOP Reality) | Source | Page |
|---|---|---|---|
| **II. Life-Threatening Risks and Medical Neglect** | 350 inmates were on a waitlist for routine dental care (FCI Sheridan), with 41% waiting 2 years or more. Indicative of National conditions. | | **11 25** |
| | Inmate Jamel Floyd was denied his antipsychotic medication (Olanzapine) for two days due to staff failure to renew an expired prescription. | OIG 23-015 Report of Investigation Regarding the Circumstances Surrounding the Death of Inmate Jamel Floyd at MDC Brooklyn | **12** |
| | Clinical personnel abruptly discontinued antidepressant prescriptions upon inmate arrival without tapering and relied solely on medical records (FCI Lewisburg). | OIG 24-113 Inspection of the Federal Bureau of Prisons Federal Correctional Institution Lewisburg | 2 |
| | Requiring disqualified Medical inmate companions to perform prohibited duties (toileting/bathing) (FMC Devens). | OIG 25-009 Inspection of the Federal Bureau of Prisons Federal Medical Center Devens | **24** |
| | 82 percent of inmates age 45 to 75 at average risk for colorectal cancer (CRC) had not yet been offered a BOP-recommended annual screening | OIG 25-081 Inspection of the Federal Bureau of Prisons' Federal Detention Center SeaTac | **10** |
| | Healthcare employees removed medication from packaging hours before pill line and reused crushing bags, risking drug cross-contamination (FCI Sheridan). | OIG 24-070 Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan | **13** |
| | TB infection contracted in custody proves BOP mitigation failure. | #319 #324 Motion for Reduction of Sentence and Reply | |
| | No contact tracing was performed after Fredrickson's TB infection was detected. | | |
| **III. Infrastructure and Unconstitutional Conditions** | The current backlog of unfunded critical infrastructure needs totals over $3 billion. | OIG Top Management and Performance Challenges Facing the Department of Justice-2024 | 4 |
| | OIG measured temperatures as high as 89°F in inmate housing units at FCI Terre Haute. Indicative of National conditions | OIG 26-001 Notification of Concerns Regarding Conditions at Federal Correctional Institution Terre Haute | **2,3,4** |
| | Staff reported inmates were working in "brutal heat" which was recorded at 93°F | OIG 25-062 Concurrent Inspections of BOP Food Service Operations | 5, 29, 62 |
| | Unsanitary conditions in food storage included rodent droppings, chewed boxes of food, and bags of cereal with insects (FCI Tallahassee). | OIG 24-005 Inspection of the Federal Bureau of Prisons' | **4, 5** |
| | Moldy bread was served to inmates, and rotting vegetables were found in refrigerators (FCI Tallahassee). | | |
| | BOP kitchens/freezers failed to maintain policy temperatures, with OIG observing numerous freezers and refrigerators exceeding limits or completely inoperable | OIG 25-062 Concurrent Inspections of BOP Food Service Operations | 6, 7 |

| Category | Summary of Violation (Unjust Punishment Imposed by BOP Reality) | Source | Page |
|---|---|---|---|
| **III. Infrastructure and Unconstitutional Conditions** | Kitchen at MCC Chicago with broken water pipes and poor drainage | OIG 25-062 Concurrent Inspections of BOP Food Service Operations | 5, 18 |
| | Ice accumulation on the floor inside and at the entrance of freezers created a serious risk of slip-and-fall injuries (USP McCreary, FCI Marianna, FCC Allenwood). | | 7 |
| | Chronic lack of light and fresh air due to metal plates covering windows | Vera Institute - Examining Prisons Today September 2018 | |
| | Female housing unit roofs routinely leak, causing water to leak from ceilings and windows near living spaces (FCI Tallahassee). | OIG 24-005 Inspection of the Federal Bureau of Prisons' | 12, 14 |
| | Many institutions are old and deteriorating beyond repair, and must be closed. The Western Region had the most unfunded needs totaling $426 million (25 percent); and the North Central and Southeast Region had the fewest unfunded needs totaling $183 million (11 percent) and 180 million (11 percent) | OIG 23-064 Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions | **11** |
| | Inoperable oxygen tank found in FCI Sheridan's trauma room for 3 days. | OIG 24-070 Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan | **10** |
| | Shortages of Correctional Officers led to the cancellation of 101 outside medical appointments. | | **12** |
| **IV. Operational, Programming, and Due Process Failure** | Wait lists for FSA-related programs were excessively long, exceeding 300 names at FCI Waseca. Indicative of National conditions | OIG 23-068 Inspection of the Federal Bureau of Prisons' | **30** |
| | Canceled inmate programs result from Correctional Officer staff requiring non-correctional staff augmentation. | OIG 24-070 Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan | **13 14 15** |
| | BOP policy does not accurately track the distance from an inmate's residence using driving miles, which significantly understates the distance from home. | OIG 25-083 Audit of the Federal Bureau of Prisons' Efforts to Place Inmates Close to Home | |
| | Incarcerated individuals from minority faiths face disproportionate obstacles to accessing worship spaces, clergy, and services. | United States Commission on Civil Rights 2025 Briefing Report Enforcing Religious Freedoms in Prison 2017-2023 | **5 16** |
| | Grievances related to religious freedom are often delayed, denied, or met with misunderstanding or outright bias. | | **5** |
| | Prisoners report that grievances are discarded or ignored, and they face procedural roadblocks in seeking redress. | | **6 71** |
| | | | |

| Category | Summary of Violation (Unjust Punishment Imposed by BOP Reality) | Source | Page |
|---|---|---|---|
| | Only 58 inmates were enrolled in vocational training, despite more than 1,200 needing it to maintain employment (FCI Sheridan). | OIG 24-070 Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan | **15** |
| | BOP staff failed to protect women prisoners from sexual abuse and misconduct from staff and other prisoners (Topeka Correctional Facility). | OIG 25-009 Inspection of the Federal Bureau of Prisons Federal Medical Center Devens | 23 |
| | Staff failed to use or effectively use metal detectors/pat searches in 15 cases of inmate death (14 homicides). | OIG 24-041 Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions | 59 |
| | BOP was unable to produce records required by its own policy (e.g., Psychological Reconstruction Reports) for 43% of inmate deaths (2014-2021). | | 40 |

In addition to *empirical* evidence, the average judge's caseload involves a significant amount of prisoner civil complaints under §1983 or Bivens, and §2241 time credit disputes based on any number of due process violations which --regardless of immunity or exhaustion-- offers further insight that must be judicially noticed.

### D. Diminished Deterrence and Respect for Law §3553(a)(2)(A)-(B)

The penological goals of promoting respect for the law and providing adequate deterrence are severely compromised when the environment of confinement is characterized by pervasive misconduct and indifference. The above reports detail rising allegations of employee misconduct, including physical and sexual abuse, coupled with dehumanizing and unsanitary living conditions, such as brutal heat and moldy food. When punishment is executed in an arbitrary and abusive manner, it fosters deep resentment rather than reformation.

The experience of chronic insecurity and environmental neglect weakens the specific deterrence aspect of the sentence, as it signals that the law enforcement system is fundamentally unjust. The loss of respect for the law that occurs when incarcerated individuals witness, or are subjected to, systemic institutional violence and neglect further reinforces the argument that the sentence imposed is failing to meet its intended purpose and should therefore be reduced.

## E. Erosion of the Mandate for Correctional Treatment §3553(a)(2)(D)

The statute explicitly requires the sentence to provide the defendant with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner". §3553(a)(2)(D). When facilities experience systemic failures in health provision, this mandate is breached. The BOP's healthcare capabilities are documented as "strained" due to limited funds, neglect, inadequate staffing, and a large, aging inmate population.

The failure to prevent the transmission of infectious diseases[14], coupled with systemic delays in critical medical care that lead to preventable complications or death[15], constitutes a profound failure of the correctional treatment factor. The inability of the BOP to provide safe, timely, or adequate care retroactively increases the severity of the sentence and undermines its proportionality, rendering continued incarceration unduly harsh. To say this factor is unchanged, would be an admission that the judge not only anticipated these failings in *fact* but also further tacitly approves the *degree*.

## IV. The *De Minimis* Threshold: The Judicial Duty to Correct Even Minor Imbalances

The *de minimis* standard here operates as a guardrail against judicial abdication. The judicial duty under 18 U.S.C. §3582(c)(1)(A) is to determine whether the sentencing factors support *any* reduction. If the factors have shifted --even slightly-- to favor a lesser sentence, the court must recognize that shift to maintain the integrity of its original judgment. A finding that the sentencing factors do not favor a reduction should be the exception, not the rule. Compassionate release is a misnomer intentionally used to imply a dichotomy --all or nothing relief-- instead the statute speaks of a sentence *reduction* by any amount including

The legal fiction of a perfect carceral environment is comprehensively shattered by the empirical evidence of systemic failures detailed in the above catalog. Consequently, the sentencing court cannot rationally conclude that the §3553(a) factors remain unchanged.

---

14 Such as Covid Nationally and Tuberculosis at Yazoo and Seagoville,
15 https://www.theguardian.com/us-news/2024/feb/15/prison-death-causes-preventable-justice-department

As should be clear by now, a *de minimis* effect[16] is not *no* effect, and relief can be equally as *de minimus*. To find otherwise is not just unrealistic, but assinine, inhuman, and utterly destroys faith in government. The District Court's conclusion that the §3553(a) factors weigh entirely against a reduction is a denial of this empirical reality. It implicitly asserts that the totality of the BOP's well documented operational failures and the imposition of life-threatening health risks have zero punitive impact, even in the aggregate. This cannot stand.

Judicial duty demands that the court determine if the §3553(a) factors favor ***any*** reduction. If accumulation of unjust punishment justifies even the *de minimis* reduction of a single day off a decade-long sentence, the court *must* recognize that shift. To ignore the fact that the sentencing factors favor even such a slight reduction is to make a legal error, thereby permitting executive misconduct and operational negligence to become a judicially ratified enhancement of the sentence. The judiciary must correct the record to uphold its sentencing integrity.

The sentence is greater than necessary as a matter of law. To ignore the cumulative, documented weight of over 46 listed unanticipated negative realities and assert that the §3553(a) balance remains entirely static against reduction implies that such systemic suffering has zero aggregate punitive impact. Such a finding would be legally erroneous and ignores the reality of penal execution.

If the original sentence of 200 months was determined to be "sufficient but not greater than necessary" based on the constitutional presumption of confinement, then every day spent in conditions that violate that presumption --such as enduring documented extreme heat (89°F or higher), or suffering delayed medical care-- adds a fractional, unauthorized, and unjust increase in punitive severity.

The cumulative sum of this increased, unjust severity, measured over years of incarceration, must legally result in at least a minimal, *de minimis* adjustment to the sentence length. To contend that the sentencing factors

---

16 It could be as minor as the comparison between an "open" compound with access to grass and trees, as opposed to a closed facility, or a more restrictive high security penitentiary compared to a minimum security satellite camp; or the distance a prisoner is housed from family; or environmental factors like fresh country air as opposed to polluted city smog, or northern winters vs Floridian ones

do not favor even the slightest reduction, such as a single day off a decade-long sentence, is to assert that the totality of documented systemic failures and personal hardship has zero effect on the proportionality of the punishment. This assertion transforms the court's sentencing mandate into a rubber stamp for executive failure.

## V. Conclusion

Fredrickson has established extraordinary and compelling reasons based on his acquired compounding medical vulnerabilities and the BOP's demonstrated, systemic failure to mitigate risk. Furthermore, the mandatory re-evaluation of the §3553(a) sentencing factors proves that the sentence has become unduly severe and **greater than necessary** due to the unanticipated cruelties of confinement. The requirement to recognize even a *de minimis* reduction serves as a critical statutory guardrail against the judiciary ceding its sentencing authority to the executive branch. Sentencing integrity demands that the court remain the final arbiter of proportionality.

For the foregoing reasons, Appellant Tim Fredrickson respectfully requests that this Honorable Court **REVERSE** the District Court's Order and **GRANT** the Motion for a sentence reduction or a substitution with supervised release accompanied by strict conditions, which may include home confinement.

/s/ Tim Fredrickson

### Declaration of Inmate Filing and Certificate of Service

I Tim Fredrickson declare under penalty of perjury that I an an inmate at FCI Seagoville and placed the foregoing in the institution's internal mail system on Dec 1 2025 with first class postage prepaid and addressed to the Clerk of Court, where it will be scanned and served an all CM/ECF participants.

/s/ Tim Fredrickson

United States District Court
Central District of Illinois

| | |
|---|---|
| United States | No. 17-cr-40032 |
| v | |
| Tim Fredrickson | Motion for First Step Act sentence modification |

Now comes the defendant, Fredrickson, respectfully requesting a reduction in sentence pursuant to Title 18 §3582(c)(1)(A)(i) and §603 of the First Step Act; and in support states as follows, set forth more fully below:

**Facts:**

1) On 1/28/2025 Fredrickson submitted a request for compassionate release[1] to the new warden under the newly amended 2023 criteria, and based it on an imminent risk of being effected by the current wave of Tuberculosis coming in from Kansas. Exhibit A

2) More than 30 days later on 3/25/2025 the request was denied, permitting review in this court[2]. Exhibit B

3) That request was denied because purportedly "avoidance of a disease is not criteria to be considered".

4) On 3/29/2025 Fredrickson submitted another request for compassionate release to the *new* new warden, this time based on the current outbreak of Measles, of which Texas is the epicenter and the nation is experiencing the highest peak in 25 years. Exhibit C

5) As of 5/10/2025 a response has not been received. A period in excess of 30 days.

Argument

**Extraordinary and Compelling**

A court may reduce a sentence "after considering the factors set forth in section 3553(a)[3] to the extent that they are applicable, if it finds that [] extraordinary and compelling reasons warrant such a reduction". §3582(c)(1)(A)(i). To assist a fact-finder in identifying "extraordinary and compelling reasons", in 2023 our Federal government added several criteria to USSG §1B1.13(b)(1)(D). In relevant part "the defendant is housed at a correctional facility affected or at imminent risk of being affected by [] an ongoing outbreak of infectious disease". Tuberculosis and/or Measles are unquestionably infectious diseases.

---

1  At no fault of government counsel, in the past Seagoville has failed to provide *proof* of the request.  It appears at Exhibit A.
2  Though never objecting to this statutory exception, the government's representatives in this court have consistently wasted this court's time by quoting paragraphs worth of standards for things not in dispute --in a bad faith effort to fatigue the judge
3  Fredrickson hereby incorporates by reference the evaluation of the sentencing factors set out in all earlier motions  [#203] [#224] for relief under this statute "to the extent that they are applicable".

In full context, USSG §1B1.13(b)(1)(D) states:

(b) EXTRAORDINARY AND COMPELLING REASONS.—Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:
    (1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT.—
        •••

        (D) The defendant presents the following circumstances—

            (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

            (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

            (iii) such risk cannot be adequately mitigated in a timely manner.

Fredrickson concedes that typically all three requirements should be met, and explains next why all three are.

**Part 1) "affected or at imminent risk of being affected"**

    There are multiple ways to satisfy the first part, which is emphasized in the following chart:



    Fredrickson is indisputably housed at a "correctional facility"; FCI Seagoville is not a halfway house or other lesser facility. Moving on, the facility is *currently* affected by tuberculosis and/or *at imminent risk* of being affected by measles. Regardless of whether the state of Texas joins New York and other states in declaring public health emergencies for either disease, evidence shows that the facility is being affected by an ongoing outbreak of tuberculosis --which infected Fredrickson. To state the obvious, Fredrickson contracted tuberculosis from the only place he has been in the last several years --the BOP. While he had tuberculosis, it further spread undetected for an undisclosed amount of time, in conjunction with the recent community outbreaks in Texas. There is no indication that the tuberculosis outbreak is not ongoing.

Texas' rate of tuberculosis cases was nearly twice the national rate in 2017 with 1,127 cases reported[4]. According to the Federal Centers for Disease Control and Prevention, Tuberculosis bacteria is spread through the air from a person who has it in their lungs or throat who coughs, speaks or sings[5]. It is so virulent that most states, including Texas, have laws expressly requiring that even *latent* tuberculosis infections ("LTBI") be reported[6].

FCI Seagoville is also "at imminent risk of being affected by" *measles*[7], another qualifying infectious disease. Texas is currently undergoing the state's largest measles outbreak in 30 years. According to the Federal Centers for Disease Control and Prevention, the measles outbreak that originated in Texas is now the largest[8] single outbreak since the United States declared the disease eliminated in 2000. An expert from University of Texas[9] was recently questioned on the topic of measles in relation to risk and transmissibility:

> **Most know measles to be a highly contagious disease. What exactly is measles, and how does it spread from person to person?**
>
> If you wanted to design a virus to be as contagious as possible, you would design measles. It has the highest reproduction rate in the world. For every one person who has the disease, they spread it to 12 to 18 people on average. That's extraordinary.
>
> With measles, a person is infected for four days before they ever get the rash. For four days, they are spreading the disease before they have signs that they're sick. Then, once the rash develops, they're contagious for another four days. So, there are eight days where they can be spreading the disease, eight days when they're highly contagious.
>
> People infected with measles are contagious four days before they begin showing rash symptoms, and the virus can stay active in the air for up to two hours, making hospitals, schools and day cares especially high-risk.

---

4   https://www.dshs.texas.gov/IDCU/disease/tb/publications/TBinTexas.pdf     There were 9,105 total U.S. tuberculosis cases in 2017
5   https://www.cdc.gov/tb/topic/basics/howtbspreads.htm
6   See  https://www.cdc.gov/tb/php/case-reporting/latent-tb-infection.html
    Tex. Health & Safety Code § 81.042        25 Tex. Admin. Code § 97.2;        25 Tex. Admin. Code § 97.3
7   https://www.cdc.gov/han/php/notices/han00522.html
    Measles is a highly contagious viral illness that typically begins with fever, cough, coryza (runny nose), and conjunctivitis (pink eye), lasting 2-4 days prior to rash onset. Measles can cause severe health complications, including pneumonia, encephalitis (inflammation of the brain), and death. The virus is transmitted by direct contact with infectious droplets or by airborne spread when an infected person breathes, coughs, or sneezes. Measles virus can remain infectious in the air and on surfaces for up to 2 hours after an infected person leaves an area. Infected people are contagious from 4 days before the rash starts through 4 days afterward. The incubation period for measles, from exposure to fever, is usually about 7–10 days, and from exposure to rash onset is usually about 10–14 days (with a range of 7 to 21 days).
8   https://www.texastribune.org/2025/05/08/texas-measles-spread-oklahoma-new-mexico/
9   Erin Carlson, associate clinical professor and director of graduate public health programs at The University of Texas at Arlington's College of Nursing and Health Innovation
https://www.uta.edu/news/news-releases/2025/03/28/q-a-uta-expert-on-texas-growing-measles-crisis

Three things are of particular focus: "the *highest* reproduction rate *in the world*" which an expert described as "extraordinary", noting both an initial four days before symptoms manifest and a two hour airborne hang-time after a person leaves the room --all things that combine to create an "especially high risk" for indoor settings like jails. Regardless of whether the state of Texas takes the official act of declaring a public health emergency[10], the Nation is currently experiencing a growing measles crisis. Initially declared eliminated in 2000, Measles is exploding in Texas. Measles has ripped through communities sprawling across more than 20 Texas counties and is poised to make measles a nationwide epidemic. On May 8, 2025, a total of 1,001[11] confirmed measles cases were reported by 31 states[12], yet a few days earlier the number of cases reported *in Texas alone* was a historic 709 cases[13] in 29 counties. As of May 9, at least 92 of those Texas patients have been hospitalized.

## Part 2) "increased risk"

Next, there is an increased risk of either "severe medical complications or death" as Fredrickson catches each of these lung respiratory diseases. After the Covid pandemic, and being further infected with tuberculosis, Fredrickson is unquestionably "at increased risk of severe medical complications" should Measles do further damage to Fredrickson's lungs. The trifecta and repeat infections even create an increased risk of *death*.



---

10 When Clark County, Washington identified its *third* measles case in January 2019, the county quickly declared a public health emergency. The state soon followed suit. https://governor.wa.gov/sites/default/files/proclamations/19-01%20State%20of%20Emergency.pdf
11 https://www.cdc.gov/measles/data-research/index.html
12 Alaska, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Montana, New Jersey, New Mexico, New York City, New York State, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington.
13 https://www.texastribune.org/2025/04/22/texas-measles-outbreak-update/

The hospitalization of one out of seven[14] Texas measles victims speaks to the risk of medical complications, or as an expert at UTA explains:

> **What are the potential health complications for those who contract it? How is it cured?**
>
> With measles, we tend to think of it as a rash, but it is a respiratory illness. Just like with influenza or COVID-19, pneumonia is a key complication that can develop.
>
> Encephalitis, inflammation of the brain that can lead to seizures and brain damage, is another leading complication. There is also a very scary brain disorder called subacute sclerosing panencephalitis, which you should think of as Alzheimer's in young people. Measles also can lead to vitamin A deficiency, which can cause eye damage and blindness.
>
> There is a misconception that measles can be treated with vitamin A, which is not true. Vitamin A supplementation helps reduce the chance of blindness, which can be a complication of measles infection.
>
> There is no cure for measles. It's just palliative treatment, helping people be comfortable.

Brain damage and blindness are severe medical complications of Measles --add to this the fact that Fredrickson has *already* been infected with Covid and Tuberculosis --two other respiratory diseases--  and the risk of medical complications involving lung damage in particular grows significantly. However Tuberculosis can *also* spread beyond the lungs to the brain, bones, spine, kidneys and other organs.

Focusing back on Tuberculosis, it alone kills more people  --over a million a year worldwide--  than any other infectious disease. Tuberculosis is the top killer of humans among infectious diseases, a longstanding status quo only briefly disrupted by COVID-19. The slow-moving TB infected over 8 million people in one year and killed about 1.25 million according to both the Centers for Disease Control and Prevention (CDC)[15] and a recent World Health Organization report. A one in eight chance of *death* is not favorable. The average hospital stay for a patient can be anywhere from three months to three years[16] depending on the severity of their illness and how well their body responds to treatment, according to state officials. While Fredrickson's infection is *theoretically* being treated, the facility merely *assumes* the TB strain infecting Fredrickson is not drug-resistant and will be cured at the end of the prescribed treatment. Fredrickson has not been to a hospital and has never seen a doctor or specialist.

14  The hospitalization of 92 out of 709 total Texans as a fraction with rounding reduces to approximately 9 out of 70,  or 1 out of 7
15  https://www.cdc.gov/tb/programs/laws/menu/appendixa.htm
16  https://www.texastribune.org/2018/12/18/texas-tuberculosis-problem-raises-alarm-legislative-attention/

**Part 3) Timely and Adequate mitigation**

The burden of showing that "such risk *can*[] be adequately mitigated in a timely manner" properly rests with the facility that purportedly would both timely and adequately mitigate the disease(s). Beginning with Tuberculosis, FCI Seagoville does do the standard yearly test  --but that pro forma "compliance" *failed* to protect Fredrickson who had pointed out several deficiencies and the need for heightened testing months before being infected.

In the aftermath of a Tuberculosis outbreak at FCI Yazoo in 2018, the neighboring FCI Seagoville was on notice for at least *six years* that current protocol was not sufficient. That 2018 outbreak demonstrated that the BOP did not "adequately mitigate[]" Tuberculosis  --much less do so "in a timely manner". Foreshadowing the events here, the BOP has now repeated that same demonstration again at FCI Seagoville. This same demonstration was similarly forecast by Seagoville's poor Covid response which made national headlines.

The detection of repeat Tuberculosis infections or flareups will be even less "timely", with a five year period between tests according to official protocol. Such a delay does not "mitigate" the spread of  Tuberculosis at all.

This pattern involving infectious diseases is the antithesis of "timely" and "adequate" mitigation, and does not bode well for Measles  --the most infectious disease *in the world*.

## Conclusion

Fredrickson is at a correctional facility both affected by Tuberculosis and at imminent risk of being affected by Measles. Due to personal health risk factors and custodial status, Fredrickson is at increased risk of suffering severe medical complications or death as a result of exposure to either (or both) infectious diseases; and this risk cannot be adequately mitigated in a timely manner by any other means except §3582(c)(1)(A)(i) based relief in the form of a reduced sentence or substitution with supervised release accompanied by a condition of home confinement

Respectfully submitted,
/s/ Tim Fredrickson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## AT ROCK ISLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. 17-40032 |
| | ) | |
| TIMOTHY FREDRICKSON, | ) | |
| | ) | |
| Defendant. | ) | |

### THE UNITED STATES OF AMERICA'S RESPONSE TO
### DEFENDANT'S MOTION FOR SENTENCE REDUCTION

NOW COMES the United States of America, by Gregory M. Gilmore, Acting
United States Attorney for the Central District of Illinois, and John Mehochko, Assistant
United States Attorney, and hereby requests that this Court deny the defendant's third
motion for compassionate release.  Defendant is ineligible for release because: 1) he
failed to meet his burden of demonstrating eligibility under the applicable
compassionate release guideline policy statement, and 2) his recidivism risk poses a
danger to the community and early release is otherwise inappropriate under the
relevant 18 U.S.C. § 3553((a) factors.

### I.      Factual Background

### A. Pursuit of Fifteen-Year-Old Girl

In December 2016, the defendant engaged in sexually explicit discussions with
not one but two minors. PSR ¶¶ 14-22. These communications first came to law
enforcement's attention when they discovered the defendant, who was twenty-seven at

1

the time, sitting alone in his car during a nighttime vehicle check at a park in Rapid

City, Illinois. PSR ¶ 14. The defendant falsely told law enforcement officers that he was

waiting for an individual whom he believed to be nineteen years old. PSR ¶¶ 14-15. The

officers were familiar with a minor of the same name and suspected the defendant

planned to meet her. PSR ¶ 14. The defendant claimed he met the individual via an

online dating application, but when the officers asked to see her profile, he said that she

had deleted it. *Id.* He provided the officers with the individual's phone number, and

they permitted him to leave, warning him that he was not allowed to be in the park,

which closed after dark. *Id.* The individual was later confirmed to be a fifteen-year-old

girl. *Id.* Further investigation – including an interview of the minor and examination of

her cell phone – revealed that the defendant had previously sent her a "Sexual Question

Survey." PSR ¶ 15. In responding to that survey, the minor had informed the defendant

that she was fifteen. *Id.*

### B. Offense Conduct

Less than two weeks later, apparently undeterred by his encounter with law

enforcement, the defendant began chatting with a second minor, a sixteen-year-old

Illinois girl named S.B., via the phone application Whisper and later through social

media. PSR ¶ 16; *see also United States v. Fredrickson*, 996 F.3d 821, 823 (7th Cir. 2021).

Though the defendant was aware of the girl's age, the conversation turned sexually

explicit. PSR ¶¶ 16-22. The defendant requested and received videos of the girl's

genitals and encouraged her to masturbate during these recordings, which he saved to

his cell phone. PSR ¶¶ 19-22.

In February 2017, the girl's mother learned that the defendant sent flowers to the girl's high school. PSR ¶ 17. That prompted the mother's discovery of the defendant's exploitative, online relationship with her daughter and a subsequent law enforcement investigation. PSR ¶¶ 17, 19-22; Trial Tr. 44. The investigation confirmed that the defendant was aware the girl was a minor. Trial Tr. 44-45, 49-50; R. 1 at 2. Law enforcement officers eventually obtained a search warrant for the defendant's residence in Davenport, Iowa, and his truck and recovered numerous electronic devices. Trial Tr. 49, 54; *see Fredrickson v. McAuliffe et al.*, No. 4:19-cv-121, R. 24, Ex. 3 (S.D. Iowa July 13, 2020). The home screen of a cell phone – which showcased the apparently topless minor victim (though she was partially covered by a pillow) – further verified the defendant's illegal communications, and the defendant himself admitted that he had requested certain sexual images and videos from the victim. PSR ¶ 18; Trial Tr. 71-73, 77, 79. Trial Tr. 59-73, 77, 79; Gov. Exs. 9, 9A, 9B; R. 1 at 4.

Investigators later obtained a federal search warrant that permitted them to search the defendant's electronic devices. R. 1 at 6; *see also* Trial Tr. 92-102. Agents discovered sexually explicit videos from the minor victim on the defendant's cell phone. *Id.* at 6-7, 151-78; PSR ¶¶ 17, 19-22. In addition to that phone, a hard drive from the residence also contained explicit videos of the minor victim that had apparently been saved to the device by the defendant. Trial Tr. 101-08, 199-200. The defendant's arrest followed. PSR ¶¶ 23-24.

### C. Criminal Prosecution, Trial, and Sentencing

A federal grand jury in the Central District of Illinois returned a single-count indictment charging the defendant with sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a), (e). R. 1, 13. Substantial pretrial litigation ensued, including the district court's denial of the defendant's motion to dismiss the indictment because his statute of conviction, 18 U.S.C. § 2251(a), purportedly violated the First Amendment and was thus unconstitutionally overbroad. R. 142, 142-1; D.E. 1/17/2020. The case proceeded to trial in January 2020, and the jury returned a verdict of guilty on January 22, 2020. D.E. 1/21/2020, 1/22/2020; R. 142, 142-1, 154.

At the sentencing hearing, S.B. provided a Victim Impact Statement detailing the psychological impact of the offense, stating "[t]o this day, I still feel absolutely humiliated, degraded, and ashamed." PSR ¶ 26. She explained that she was made to feel guilty for what had occurred but that the defendant, "the one true guilty person in this case was the one person who never once accepted blame for it." *Id.* S.B. told the court she did not feel she would "ever fully recover emotionally or mentally from this case." *Id.*

The defendant had no prior criminal history. PSR ¶ ¶ 42-46. He reported that he was in good physical health, took no medication, and was experiencing no ailments other than knee, back, and ankle pain from lack of physical exercise. *Id.* ¶ 57. The defendant's statutory sentencing range for his offense was a term of imprisonment between 15 and 30 years. 18 U.S.C. § 2251(e). The PSR calculated his Sentencing Guidelines range as 235-293 months in prison. PSR ¶ 79. The Court sentenced the

defendant to 200 months in prison, to be followed by 10 years of supervised release. R.183. The Court stated that it imposed a sentence below the Guidelines range "because the defendant has no prior record" and 200 months was "sufficient but not greater than necessary." R.185.

The court entered final judgment the next day, and the defendant timely filed a notice of appeal. R. 183, 188.

### D. Direct Appeal

The defendant's direct appeal reprised his argument that his statute of conviction, 18 U.S.C. § 2251(a), was unconstitutionally overbroad. *United States v. Fredrickson*, 996 F.3d 821, 823 (7th Cir. 2021). The Seventh Circuit it and affirmed his conviction, holding that the inducement statute was not unconstitutionally overbroad in violation of the defendant's First Amendment rights: while "the First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech,'" the Supreme Court has held that "child pornography was categorically unprotected under the First Amendment." *Id.* at 824 (citing *New York v. Ferber*, 458 U.S. 747, 763 (1982)). "From the moment Fredrickson persuaded S.B. to record and send him sexually explicit videos, he committed a federal crime — one 'fully proscribable' under the Constitution." *Id.* at 825.

### E. First Compassionate Release Motion

On January 18, 2022, the defendant filed a pro se motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). R. 203. The defendant's main was that his sentence was unjustly long considering the facts of the case. *Id.* He also argued that

5

other "various factors" favored release, including the sentencing factors under 18 U.S.C. § 3553(a) and the impact of COVID-19 on the prison system.  This Court denied the motion, along with his subsequent motion to reconsider. R. 214, 215; D.E. 1/19/2022, 3/21/2022. The defendant appealed the denials of both that motion for compassionate release and the motion to reconsider. *United States v. Fredrickson*, No. 22-1542, 2022 WL 16960322 (7th Cir. Nov. 16, 2022). The Seventh Circuit affirmed the judgment of the district court. *Id.*

### F.  Second Compassionate Release Motion

Subsequently, in June 2022, the defendant filed a second pro se compassionate release motion, asserting (1) his facility had not effectively managed COVID-19 or vaccinations; (2) his religion prohibited vaccination; and (3) BOP wrongly restricted him from accessing various prison amenities based on his offense conduct. R.224. The district court denied the motion without prejudice on September 15, 2022, citing the defendant's failure to exhaust his administrative remedies. R. 232.  The defendant subsequently filed a motion for reconsideration of the denial, which the court denied in a text order. R. 241; D.E. 12/15/2022. The Seventh Circuit affirmed the judgment of the district court. *United States v. Fredrickson*, No. 23-1042, 2023 WL 6859761 (7th Cir. Oct. 18, 2023).

### G. Section 2255 Motion and Related Litigation

Meanwhile, on October 18, 2022, while both compassionate release appeals were still pending, the defendant filed a motion under 28 U.S.C. § 2255 raising over 80 claims regarding the investigation of his offense, his prosecution and trial, his attorney's

performance, and the constitutionality of the statute under which he was convicted, among others. R. 239. In addition, the defendant filed a number of other motions (most while the § 2255 was still pending) among them a motion to recuse the district judge, a motion for a magistrate to oversee his § 2255, a motion for bond, a motion for new trial, and a motion for return of seized property. *See* R. 236, 242, 243, 245, 279. Those were denied and the defendant appealed all of them. The Seventh Circuit affirmed their denial, while also warning the defendant that his pattern of frivolous litigation risked incurring sanctions:

> Finally, we note that Fredrickson has displayed a persistent pattern of filing repetitive, frivolous motions and immediately appealed nearly every ruling with little regard to the finality of the decision or the merits of the appeal. We therefore warn Fredrickson that he risks monetary sanctions and a filing bar under *Alexander v. United States*, 121 F.3d 312, 316 (7th Cir. 1997), if he files further interlocutory appeals with no statutory basis or other frivolous, repetitive, or excessive appeals.

R. 294 at 5.

On November 18, 2024, this Court denied the § 2255 motion in full and declined to issue a certificate of appealability. R. 300. The defendant filed a motion to reconsider and motion for certificate of appealability, both of which this Court also denied. R. 303, 304, 311. The defendant filed a notice of appeal, and that appeal remains pending before the Seventh Circuit. R. 305.

### H. Third Compassionate Release Motion

On June 9, 2025, the defendant filed a third motion for compassionate release, styled as "Motion for First Step Act Sentence Modification," seeking early release from prison less than halfway through his sentence based on alleged health threats from

tuberculosis and measles. R. 319. The motion included no proposed release plan. The government was ordered to file a response to defendant's motion by September 2, 2025.

## I.    Defendant's BOP History

The defendant is currently housed at FCI Seagoville. His projected release date from the BOP is September 15, 2031, assuming no further loss of good time credit. *See*, Timothy Fredrickson, Reg. No. 22005-026, Find an Inmate, www.bop.gov/inmateloc/ (last visited August 28, 2025).

While incarcerated in BOP, the defendant has incurred the followed disciplinary infractions:

Possessing Drugs/Alcohol, February 26, 2025

Destroying Property, August 8, 2022

Possessing a Hazardous Tool, March 12, 2022

Possessing an Unauthorized Item and Refusing to Obey an Order, April 23, 2021

*See* Defendant's Disciplinary Record, Govt. Exhibit 1, attached.

The defendant's BOP medical records indicate he was diagnosed with latent tuberculosis in March of 2025, for which he was prescribed a course of medication that he completed in June of 2025. *See* Defendant's 2025 Medical Records, Govt. Exhibit 2, attached at 1, 7-8, 10-11, 53. The defendant's lungs were examined and found to be clear, and to date he has not disclosed any symptoms of active tuberculosis infection. *Id.*

## II.    Argument

Defendant's request for compassionate release should be denied as it fails to satisfy any of the relevant policy statement criteria for compassionate release. He has not shown that FCI Seagoville is "affected or at imminent risk of being affected" by either "an ongoing outbreak of infectious disease" or "an ongoing public health emergency," that he is "at increased risk of suffering severe medical complications or death," or that any such risk, even if it existed, "cannot be mitigated in a timely manner." U.S.S.G. § 1B1.13(b)(1)(D).

Moreover, even if the defendant had carried his burden of establishing the policy statement requirements, the Court should still deny relief because both the 18 U.S.C. § 3553(a) factors and the defendant's danger to the community weigh strongly against his early release.

### A. Legal Background

A sentence of imprisonment is a final judgment that a court cannot modify unless certain exceptions exist. 18 U.S.C. § 3582(b).  One such exception permits compassionate release under 18 U.S.C. § 3582(c)(1)(A), which authorizes a district court to reduce a defendant's term of imprisonment upon a finding that (1) extraordinary and compelling reasons warrant release; and (2) a reduction is consistent with the sentencing factors of 18 U.S.C. § 3553(a) and the applicable Sentencing Commission policy statements. *Id.*

Before filing a motion for a reduction under 18 U.S.C. § 3582(c)(1)(A), defendants must request that BOP file the motion on their behalf. A court may only consider a

motion brought by a defendant directly if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after thirty days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The exhaustion requirement is mandatory and must be enforced when the government properly invokes it. *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021). The mandatory nature of the exhaustion requirement flows from the established principle that finality is an important attribute of criminal judgments, and it is "essential to the operation of our criminal justice system." *Teague v. Lane,* 489 U.S. 288, 309 (1989) (plurality opinion).

Compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019) ("a compassionate release due to a medical condition is an extraordinary and rare event[.]"). As the movant, the defendant bears the burden of establishing that he is eligible for compassionate release. *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021).

### B.  The Sentencing Guidelines Policy Statement

Section 3582(c)(1)(A) specifically instructs that any sentence reduction ordered by a court be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). An applicable policy statement is binding on the Court, and the Court therefore may not grant a sentence reduction outside of the

circumstances the Commission has detailed in Section 1B1.13. *See Dillon*, 560 U.S. at 826-27 (interpreting identical language as used in Section 3582(c)(2)).

Section 1B1.13 includes three considerations: (1) whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement[,]" U.S.S.G. § 1B1.13(a)(1)(A) and (a)(3); (2) whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[,]" U.S.S.G. § 1B1.13(a)(2); and (3) the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13(a).

The policy statement set forth in U.S.S.G. § 1B1.13(b)(1) provides the various criteria for medical issues that may constitute "Extraordinary and Compelling Reasons" warranting a sentence reduction.  The defendant asserts he qualifies based upon the following:

(1) Medical Circumstances of the Defendant. —

(D) The defendant presents the following circumstances--

    **(i)**    the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

    **(ii)**    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

    **(iii)**    such risk cannot be adequately mitigated in a timely manner.

U.S.S.G. § 1B1.13.  Here, the defendant can establish none of the three criteria for eligibility, let alone all three as required to establish extraordinary and compelling circumstances under the policy statement.

### C. The Defendant Failed to Establish Any of the Required Guideline Policy Statement Elements in Support of his Motion

As the movant, the defendant bears the burden of establishing that he is eligible for compassionate release. *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021).  But defendant's six-page motion, which is full of conclusory statements but short on facts, fails to do so.

### 1. The defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority.

The defendant simply alleges FCI Seagoville "is *currently* affected by tuberculosis and/or *at imminent risk* of being affected by measles." R. 319 at 2 (emphasis in original). He says "evidence shows" the institution is being affected by an ongoing outbreak of tuberculosis but cites no "evidence" other than his own claim that he contracted tuberculosis from "the only place he has been in the last several years – the BOP." *Id.*

Defendant's medical records confirm he was diagnosed in March 2025 with latent, not active, tuberculosis, for which he received a full course of medication treatment that he completed in June of 2025.  *See* Govt. Exhibit 2 at 1, 7-8.  Latent tuberculosis is the presence of a small amount of tuberculosis germs, alive but inactive, in a patient; however, the patient does not feel sick, has no symptoms, and cannot spread tuberculosis to others.  *See* Centers for Disease Control ("CDC"), About Inactive

Tuberculosis, www.cdc.gov/tb/about/inactive-tuberculosis.html (visited August 28, 2025).  Since latent tuberculosis cannot be spread to others, its presence in the defendant in March of 2025, which has since been treated, is not evidence that FCI Seagoville is "affected or at imminent risk of being affected" by an "ongoing outbreak" or a declared public health emergency.  U.S.S.G. § 1B1.13(b)(1)(D)(i).  Similarly, the germs associated with latent tuberculosis such as the defendant had in March of 2025 can lay dormant in the body for years, so it's discovery in March is not indicative of when or how it entered the defendant's body.  *Id.*  Moreover, latent tuberculosis is very different from an active tuberculosis infection; active tuberculosis may be spread by the patient and cause serious health issues if not treated. *See* CDC, About Active Tuberculosis, www.cdc.gov/tb/about/active-tuberculosis.html (visited August 29, 2025). But even active tuberculosis can almost always be treated and cured with medication.  *Id.*

In addition to conflating his treated, latent tuberculosis with an active tuberculosis infection, the defendant also attempts to turn his statutory burden of proof on its head with the odd claim that "[t]here is no indication that the tuberculosis outbreak is not ongoing." R. 319 at 2. But the defendant bears the burden of proof and must establish the existence of an outbreak; he cannot satisfy that burden by providing no evidence, then claiming the absence of evidence that there is no outbreak conclusively establishes that there is one.

Similarly, the defendant alleges that his institution is also "'at imminent risk of being affected by' *measles*" and states that Texas is undergoing the state's largest measles outbreak in 30 years.  R. 319 at 3 (emphasis in original).  The defendant offers

13

19

no evidence as to his institution specifically, as required by the policy statement.

Moreover, to the extent the defendant attempts to substitute a measles outbreak in parts

of Texas for FCI Seagoville itself being "affected or at imminent risk of being affected"

by measles, that attempt also fails. Texas has declared the measles outbreak over, noting

there have been no new confirmed cases in more than 42 days. *See* "Measles Outbreak is

Over, Texas Health Officials Say" August 18, 2025,

www.cnn.com/2025/08/18/health/texas-measles-outbreak-declared-over (visited

August 28, 2025). The article also notes that those primarily affected were children (not

adults such as the defendant) with more than two-thirds of the reported 762 cases in

children and two unfortunate deaths of school-aged children (the first deaths from

measles in the U.S. since 2015). *Id.*

2. **Due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i).**

In similar fashion, the defendant simply alleges, without evidence, that "[a]fter

the Covid pandemic, and being further infected with tuberculosis, Fredrickson is

unquestionably 'at increased risk of severe medical complications' should Measles do

further damage to Fredrickson's lungs." R. 319 at 4. But neither BOP medical records,

nor the defendant, offer any evidence the defendant's lungs were previously damaged

at all, let alone at increased risk of being damaged "further." Govt. Ex. 2 at 7, 53 ('lungs

are clear"). The defendant has offered no evidence he is "at increased risk of suffering

severe medical complication or death" from either tuberculosis or measles.

As to tuberculosis, the defendant vastly overstates his potential exposure. He cites what appear to be worldwide statistics of over 8 million people infected with tuberculosis and 1.25 million dying in one year (he does not say which year), but his source is unknown; he references both the CDC and the World Health Organization, but the CDC link he cites as his source in the footnote is dead. R. 319 at 5, n.15; *see also* Govt. Ex. 3, attached. In fact, the CDC statistics for the United States indicate the incidence of tuberculosis infection has been declining for years, with the most recent available data for 2023 showing 9,633 reported cases, 565 deaths, and a mortality rate of 0.2 per 100,000 (not the 1 in 8 claimed by the defendant). *See* CDC, Reported Tuberculosis in the United States, 2023, www.cdc.gov/tb-surveillance-report-2023/summary/national.html (visited August 28, 2025).

Only after reciting these inaccurate statistics does the defendant grudgingly admit that he is "theoretically" receiving treatment for tuberculosis, though he obscures the nature of it, omitting any mention of it being non-contagious, non-symptomatic latent tuberculosis, and claims "the facility merely assumes the tuberculosis strain infecting Fredrickson is not drug-resistant and will be cured at the end of the prescribed treatment." R. 319 at 5. In fact, as discussed above, BOP medical records show the defendant's lungs were examined in March of 2025 and were clear, with no evidence of active tuberculosis infection and the defendant denying any symptoms of active infection. Govt. Ex. 2 at 7, 10-11, 53. The defendant was prescribed a course of rifapentine and isoniazid medication for latent tuberculosis treatment, which he completed in June of 2025. *Id.* at 1, 8. His medical records reveal no complaints of

active tuberculosis symptoms.  *See generally* Govt. Ex. 2.  Moreover, even if the

defendant had not received medication to treat his latent tuberculosis, CDC statistics

indicate that only 1 in 10 people with inactive tuberculosis will eventually develop

active tuberculosis.  *See* CDC, About Inactive Tuberculosis,

www.cdc.gov/tb/about/inactive-tuberculosis.html (visited August 28, 2025).  Further,

even active tuberculosis can almost always be treated and cured with medication. *See*

CDC, About Active Tuberculosis, www.cdc.gov/tb/about/active-tuberculosis.html

(visited August 29, 2025).

As to defendant's measles-based claim, even aside from the measles outbreak in

Texas being over, the defendant offers no evidence he is at "increased risk of suffering

severe medical complications or death" from measles.  He speculates, without citing

any support, that his risk of lung damage is heightened because he has previously been

infected with Covid-19 and tuberculosis.  R. 319 at 5.  But as discussed above, the

defendant was diagnosed with latent, not active, tuberculosis, and his medical exam

showed no indication of lung infection or damage.  Moreover, a highly effective measles

vaccine is available and has been widely administered for decades; once given, it

generally imparts protection for life. *See* www.cdc.gov/measles/vaccines/index.html

(last visited August 28, 2025).  The defendant's motion is silent as to his measles

vaccination status, but as a student growing up in Galva, Illinois, and attending Illinois

schools, he was required to obtain a measles vaccine.  *See* CDC 2001-2002 State

Immunization Requirements, Govt. Ex. 4 at 12-15, attached; PSR ¶¶ 50, 67.  Thus he

very likely already enjoys immunity from contracting measles.

In any event, if the defendant has not been vaccinated, any health risk he faces from measles can be easily mitigated by vaccination. As such, vaccination, not early release from prison, is the appropriate response. *See United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021) ("[P]risoners who have access to a vaccine cannot use the risk of COVID-19 to obtain compassionate release."); *United States v. Broadfield*, 5 F.4th 801, 802-03 (7th Cir. 2021) (defendant "who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an 'extraordinary and compelling' justification for release.").

### 3. The risk, if any, to the defendant cannot be adequately mitigated in a timely manner.

Though the defendant's motion does not address it, he also fails to establish the third prong of the relevant policy statement, that any risk to him cannot be adequately mitigated in a timely manner. U.S.S.G. § 1B1.13(b)(1)(D)(iii). As is apparent from the discussion above, he has already undergone a course of treatment for latent tuberculosis and shows no signs of active infection. If he does somehow contract active tuberculosis, a highly effective medication regime is also available.

His likelihood of contracting measles was likely already addressed in childhood with the administration of a measles vaccine, but if not, the administration of a vaccine would mitigate any potential harm. Although the defendant filed a compassionate release request with the warden complaining about the possibility of a measles outbreak and requesting early release from prison before completing even half his

sentence, his medical records give no indication he sought a more straightforward path

to protection via measles vaccination.

Because the defendant cannot carry his burden of establishing any of the three

required elements of the relevant policy statement, his motion must be denied.

### D. The Weight of the Applicable 18 U.S.C. § 3553(a) Sentencing Factors and the Defendant's Continued Danger to the Community Require That the Motion be Denied

Even if the defendant had established threshold statutory eligibility for

compassionate release under the policy statement, that does not mean that this Court

should grant relief.  Under the applicable policy statement, this Court should deny a

sentence reduction unless it also determines the defendant "is not a danger to the safety

of any other person or to the community."  U.S.S.G. § 1B1.13(a)(2). Additionally, this

Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* 18

U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The defendant solicited a minor to produce pornographic videos for him, then

screen-recorded and saved those videos for his own enjoyment. PSR ¶¶ 16-25. He also

corresponded with another minor who he attempted to meet in person. PSR ¶¶ 14-15.

The devasting impact of his actions on the child victim in this case were readily

apparent from the Victim Impact Statement submitted at sentencing. PSR ¶ 26.  Then in

response to the defendant's first compassionate release motion in 2022, S.B. submitted

another Victim Impact Statement opposing the request, pursuant to 18 U.S.C. §

3771(a)(4).  R. 210, Exhibit 5. The statement particularly emphasized that a reduction in

the defendant's sentence would undermine the victim's confidence that the defendant

received a just sentence which reflects the seriousness of the offense and will deter him

from future crimes. As S.B. noted in her statement, "He was sentenced for 16 years for a

reason. . . . [The defendant] needs all of that time to really think about what happened

and to realize that no matter what the scenario, it was all wrong and illegal. . . . Not

even halfway through the time he was sentenced to and he believes he deserves to be let

out." R. 210, Exhibit 5.

When notified the defendant had filed a third compassionate release motion,

A.B. prepared and submitted another Victim Impact Statement.  It is a poignant

expression of both A.B.'s strength and the deep and long-lasting harm the defendant's

actions continue to have on her:

> Almost 9 years ago, I was being sexually exploited by a then 27 year old male. I
> was 16 years old at the time. I have spent YEARS trying to feel comfortable in my
> own body after this case started. There are things I still don't feel comfortable
> doing with my life partner as a result of this man's use of me. I have been
> fighting to get my life back since 2017. I suffer from PTSD as a result of this trial
> that seems never ending. I refuse to use his name in this letter as I feel he would
> enjoy that too much. He continues to torture my family and I relentlessly by
> filing motions and appeals constantly. I can't heal and move on if I am constantly
> being brought right back to where it all began. I got an email today from my
> witness advocate and instantly felt panic. I was so anxious that I couldn't finish
> my dinner. I left the restaurant and waited staring at my phone for her to call me
> and tell me what horrible thing he has done now. I told my mother the news and
> her face instantly became terrified and sickened. Once again, her baby girl was
> being tortured by this man.
>
> Not only do I think he should remain where he belongs, I think there should be
> consequences for continuing to put me through this pain. I testified in court in
> 2020 to protect young girls everywhere from this man. I faced my fears to protect
> my little sister from going through what I did. I refuse to stop fighting for justice
> and peace for myself and for every young girl out there. I want him to stay
> locked away from the young girls of the world as long as possible. I want my
> sister to grow up safe from him. She will be 18 when he is set to be released,
> which is older than his type. I once again want to point out that even though I

was the only victim to stand up in court against this man, there were other girls that he did this too. I was not the only victim but I will be damned if I am not the last. No one should have to go through what he has put me through.

I am getting closer to the age he was at the time of his crime and the Demi Lovato song "29" plays in my head daily. One lyric says, "finally 29, 17 would never cross my mind. Thought it was a teenage dream, just a fantasy, but it was yours, it wasn't mine". I am 25 and a General Manager of a restaurant now where I manage a few 17 and 18 year olds, and I can't begin to imagine engaging in any sort of sexual acts with them like he did to me. They are just kids full of life and innocence... like I was. I was just a kid and he took that from me. I will never be the same after what he did to me. I started sobbing tonight while writing this because I feel the exact same way I did all those years ago. I feel used, hurt, exposed, violated, and disgusted. Years of therapy hasn't been able to undo what he did to me in a couple months. In that sense, 16 years with time taken off for good behavior is nothing compared to the lifetime I have to live with what he did to me.

Filing a "motion of compassion" is ironic coming from a man that can't show the smallest amount of compassion to me by leaving me alone. Not surprising considering he has been screaming his innocence since day one. During sentencing, his statement to me was him saying he did nothing wrong and that if he had done the same actions in person, he would be a free man. He shows no remorse and I believe will try it again in person with a young girl once he does get out. Heed my warning and protect our youth from this disgusting excuse for a man. "The road to Hell is paved with good intentions" -The Judge who sentenced him. Show some compassion to his victims and keep us safe from him.

*See* Victim Impact Statement, Govt. Ex. 5, attached.

Whatever mitigating § 3553(a) factors were present in this case were already taken into account by the Court at sentencing when it imposed a sentence slightly below the Guideline range, which the Court noted was "because the defendant has no prior record" and that the 200-month sentence was "sufficient but not greater than necessary" based on the sentencing factors. R.185. But the Court clearly considered the offense conduct to be extremely serious, noting "[i]it was your conduct that degraded the victim, and I find this conduct to be extremely serious. . . . [i]t's clear that the harm

that you did here is not only serious but long-lasting, maybe permanent." R.194 at 55.
"The bottom of the guideline range is 235. I think in view of the fact that the defendant
has no prior record, in spite of the other concerns I have, I think that is too high." *Id.* at
58. The Court carefully weighed the § 3553(a) factors and imposed a sentence that
would balance the seriousness of the offense with the defendant's history and other
considerations.

The defendant has not provided any basis to change the Court's original
calculation of an appropriate sentence based on the § 3553(a) sentencing factors. To the
contrary, since sentencing, the defendant has engaged in a pattern of repeated frivolous
litigation that has already earned him a warning from the Seventh Circuit about
possible sanctions.  He continues to refuse to accept responsibility for his actions, and as
S.B. notes in her most recent impact statement, persists in his belief that he did nothing
wrong, which also raises grave concerns about the defendant's likelihood to reoffend
upon release and the consequent danger to the community. The defendant has
completed less than half of the 200-month sentence this Court imposed. A reduction in
the defendant's sentence would undermine the seriousness of the offense, respect for
the law, just punishment, adequate deterrence, protection of the public from further
crimes, and the need for correctional treatment. 18 U.S.C. § 3553(a)(2)(A)-(D).

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court deny the defendant's motion for sentence reduction.

Respectfully submitted,

GREGORY M. GILMORE
ACTING UNITED STATES ATTORNEY

s/John Mehochko
John Mehochko
Assistant United States Attorney
1515 5th Ave., Suite 600
Moline, Illinois 61265
Telephone (309) 793-5884

## CERTIFICATION OF SERVICE

**I HEREBY CERTIFY** that on September 2, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system mailed a copy to:

Timothy Brandon Fredrickson
Inmate #22005-026
Federal Correctional Institution
Inmate Mail/Parcels
P.O. BOX 9000
Seagoville, TX 75159

/s/ Angie Hutton
Legal Assistant

United States
v
Tim Fredrickson

No. 17-cr-40032

## Defendant's Reply in Support of Motion for First Step Act Sentence Modification

### I. Introduction

Now comes the defendant, Fredrickson, in reply to the government's response [#321]. The purpose of this filing is to address and rebut the arguments set forth in the Government's Response, which erroneously contends that Fredrickson is ineligible for relief and that his release would pose a danger to the community. The motion is not a request for a new sentencing hearing to re-litigate issues already decided. Rather, it is a response to an extraordinary and unforeseen confluence of medical circumstances and public health risks that have fundamentally altered the conditions of Fredrickson's incarceration since the Court imposed its original sentence.

The Government's response is founded on a flawed, selective, and misleading interpretation of the facts and an incomplete understanding of both the relevant medical science and the unique epidemiological realities of a correctional facility. As demonstrated below, Fredrickson has met his burden under the law, establishing extraordinary and compelling reasons for a sentence reduction, and government does not conduct any actual analysis of any "applicable" §3553(a) factors, because there are none that have changed since the time of sentencing to become "applicable" with new force[1] and the government cannot force them to become applicable.

### II. The Defendant Has Met His Burden of Establishing Extraordinary and Compelling Reasons Under USSG § 1B1.13(b)(1)(D)

The Government's central argument rests on the claim that Fredrickson has failed to establish three elements of the policy statement regarding infectious diseases. This claim is based on a narrow, almost clerical, reading of the policy that ignores its clear intent. A proper and medically informed analysis of the circumstances shows that Fredrickson has met his burden on all three counts.

---

1 The statute clearly contemplates this situation. See §3582(c) (1)(A)(i) "after considering the factors set forth in section 3553(a) **to the extent that they are applicable,** if it finds that [] extraordinary and compelling reasons warrant such a reduction".

**A. The Facility Is Affected by an Ongoing Outbreak and/or at Imminent Risk of Being Affected by an Ongoing Outbreak of Infectious Disease.**

The Government's position is that FCI Seagoville is not an "affected" facility because Fredrickson's tuberculosis (TB) diagnosis was for a "latent" infection, and the measles outbreak in Texas is "over". This argument is incorrect on both counts.

First, the Government concedes that Fredrickson was diagnosed with *latent* TB in March 2025. This is not a trivial or irrelevant fact. The policy statement, USSG § 1B1.13(b)(1)(D), requires a showing that the "correctional facility [is] affected... by (I) an ongoing outbreak of infectious disease". id. The presence of a new TB infection within the facility itself, regardless of whether it is active or latent, is irrefutable evidence that the facility is "affected". The source of this infection is also self-evident, as Fredrickson has been removed from the community for years, having clearly contracted the disease from "the only place he has been in the last several years --the BOP". Dkt #319 @2. The Government's focus on the distinction between active and latent TB is a red herring; the policy statement requires only that the facility be "affected", which a new infection plainly demonstrates. That the infection was diagnosed as latent rather than active is a matter of chance and timing, not a testament to the BOP's effective mitigation. Moreover, it must have been active before later becoming latent. Furthermore, the government places trust in one mere nurse's assessment that it was in fact latent, while also overlooking the suspicion of loyalty to their employer. The interest of justice is in accuracy, and an outside opinion by specialists that lack the threat of bias is appropriate.

Second, the Government's reliance on a single news report from August 2025 to declare the measles outbreak "over" is a classic temporal fallacy. Dkt #321 @ 14. Fredrickson's motion for release was submitted in June 2025[2], when the outbreak was at its peak. At that time, a CDC notice confirmed a rapidly expanding outbreak in Texas and other jurisdictions, with 222 cases reported across 12 U.S. jurisdictions, and over 93% of all cases being outbreak-associated. Fredrickson's claim that the facility was at "imminent risk" was not only reasonable but factually accurate at the time his motion was filed.

---

2   As a case participant receiving notice of filing, the government engaged in strategic gamesmanship purposefully neglecting a response in an attempt to out-wait the current wave  --a common tactic under COVID-19. This led to the motion being pressed in August 2025.  Dkt 320

The legal analysis of "imminent risk" in a correctional setting cannot be equated with the risk to the general public. Measles is a disease with the "highest reproduction rate in the world", transmitted via airborne particles that can linger for up to two hours after an infected person leaves a room. Dkt #319 @3. In a prison, where "social distancing" is undeniably more difficult or impossible to accomplish, the risk of a new outbreak is perpetually "imminent". Therefore, a state or local declaration that an outbreak is "over" for the general population does not extinguish the unique and ever-present risk to a confined, high-density prison population. A nuanced understanding of the policy statement, one that accounts for the specific challenges of incarceral epidemiology, reveals that Fredrickson's concerns were, *and remain*, valid.

## B. The Defendant Is at Increased Risk of Suffering Severe Medical Complications or Death.

The Government's assertion that Fredrickson's medical history poses no heightened risk is a gross oversimplification that ignores well-established medical science. The government claims that Fredrickson's lungs are "clear" and that there is no evidence he is at "increased risk". Dkt #321 @14-15. This position is medically unsound and dismisses the synergistic effect of his prior infections and the known long-term consequences of respiratory diseases. It is also a medical opinion which it is not qualified to provide.

First, medical research confirms a causal link between COVID-19 infection and the *reactivation* of latent TB[3]. COVID-19 has not been eliminated, and as a respiratory illness, can cause an "immuno-suppressive state" and deplete the white blood-cells that are critical for walling off latent TB bacteria that are fighting to become an "active" infection. The TB bacterium is an "opportunistic pathogen" that remains latent, "waiting for people's immune system to become compromised" before it can activate[3]. Therefore, whether a future Covid or measles infection, this medical vulnerability makes a "latent" TB diagnosis a far more serious threat than the Government admits. It is a known medical reality that immunosuppression from an acute viral infection can trigger a dormant bacterial infection, and vice versa.

---

3   https://redetb.org.br/covid-19-could-activate-latent-tuberculosis/
    https://www.researchgate.net/publication/359432288_Reactivation_of_Tuberculosis_in_the_Setting_of_COVID-19_Infection

Second, the claim that Fredrickson's lungs are "clear" is contradicted by extensive medical literature. Post-acute COVID-19 syndrome, commonly known as "long COVID," includes respiratory complications and lung sequelae, such as pulmonary fibrosis[4]. The incidence of post-COVID pulmonary fibrosis has been reported to range from 20% to 70% in survivors[3]. This chronic damage, which may not be readily apparent from a standard medical examination, particularly one tasked with looking for active TB instead, significantly increases the risk of "severe medical complications or death" from subsequent respiratory illnesses. Dkt #319 @4-5.

The trifecta of a past COVID-19 infection, a current latent TB infection, and the threat of an extremely contagious airborne virus like Measles creates a unique and compelling medical justification for a reduction in sentence[5]. A prior illness does not vanish without a trace; it can leave behind long-term vulnerabilities that compound the risk from new diseases. Fredrickson emphasized this, and the government's narrow focus on the immediate symptoms entirely ignores this compounding risk. The court should take that as a concession.

The following table summarizes the compounding health risks that collectively constitute a profound and extraordinary threat to Fredrickson's well-being:

| Health Factor | Government's Claim | Rebuttal and Analysis |
|---|---|---|
| **Latent Tuberculosis** | "Non-contagious" and "not indicative" of an outbreak. | A new infection contracted in custody proves the facility is "affected." The latent state is a ticking time bomb, susceptible to reactivation from other illnesses. |
| **Lung damage** | Lungs are "clear", posing no increased risk. | A medically documented link exists between COVID-19 and T-cell depletion, which increases the risk of latent TB reactivation. Long-term lung damage from either disease is a common complication that the nurse did not look for. |
| **Measles Outbreak** | The outbreak is "over". | The outbreak was active and expanding at the time of the filing. The virus's high transmissibility makes the risk perpetual in a confined setting. |
| **Combined Risk** | No evidence of "increased risk of severe medical complications or death". | The synergistic effect of a weakened immune system and lung damage from TB and COVID-19 create a unique and profound risk from both TB reactivation and Measles. This is a confluence of risk factors that was not present at sentencing. |

---

4   https://e-trd.org/journal/view.php?doi=10.4046/trd.2022.0053
5   The statute also authorizes substituting the remainder of the sentence with supervised release, with new conditions.

## C. The Risk Cannot Be Adequately Mitigated in a Timely Manner.

The Government's final argument, that the risks can be adequately mitigated by BOP's standard protocols, is undermined by the very facts of this case. The existence of Fredrickson's latent TB infection is itself direct evidence of the BOP's failure to "adequately mitigate" the spread of infectious disease, nor is it an isolated incidence[6]. Despite having an annual screening protocol for TB, the system failed to prevent Fredrickson from contracting the disease. Fredrickson's motion points out this deficiency and notes that the BOP was on notice of similar failures from a 2018 TB outbreak at FCI Yazoo, a neighboring facility. Dkt #319 @6. The BOP's own internal documents admit that core public health measures like "social distancing" are "more difficult to accomplish in a correctional setting"[7]. In such an environment, the risk of a highly contagious, airborne disease like Tuberculosis and Measles spreading rapidly cannot be "adequately mitigated".

The Government's suggestion that Fredrickson can simply get a measles vaccine to mitigate the risk misses the point entirely. The statute is for circumstances where the risk is so great that it cannot be "adequately" mitigated *within the carceral environment*. The need to pursue medical treatment or vaccination is not the issue; the issue is that the facility itself is not, and cannot be, a safe environment for an individual with Fredrickson's compounding vulnerabilities.

## III. The Applicable 18 U.S.C. § 3553(a) Factors Support a Reduction in Sentence

The Government argues that the original sentencing factors and the defendant's subsequent conduct weigh against release. This is a misapplication of the law and a mischaracterization of the defendant's actions.

## A. The Seriousness of the Offense and the Need for Just Punishment.

In 2020, the Court found that an original sentence of 200 months was a just and appropriate punishment *at the time it was imposed*. The Court specifically stated that the sentence was "sufficient but not greater than necessary". However, a sentence is a final judgment only until new, extraordinary, and compelling reasons

---

6   Graves v Nash, no. 20-cv-00727 (S.D.Miss June 7, 2022)    Copeland v Chambers, No. 20-cv-00585 (S.D.Miss Jan 20, 2022)
7   https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf    at page 6 and/or 9

warrant a modification. The new medical risks --the dual threat of TB and measles in a COVID-weakened system-- were not, and could not have been, considered at the time of sentencing. Granting this motion is not an affront to the original judgment but an application of the very mechanism Congress created to address such unforeseen and life-threatening circumstances. The core purpose of the First Step Act is to allow courts to re-evaluate sentences based on new realities that a judge, at the time of sentencing, could not have anticipated[8].

## B. The Defendant Does Not Pose a Danger to the Community

The Government's most misleading claim is that Fredrickson's "persistent pattern of filing repetitive, frivolous[9] motions" demonstrates a danger to the community. Dkt #321 @7. This is a mischaracterization of Fredrickson's legal conduct and an unfair attack on a *pro se* litigant's rights.

While a warning from the Seventh Circuit is serious, the legal definition of "frivolous" litigation often applies to *pro se* litigants due to their "limited knowledge of the law and procedure". Fredrickson's actions, which perhaps some would say are legally unsophisticated, demonstrate a deep and persistent belief in the legal system. Fredrickson has pursued *every* legal avenue available to him to contest his conviction and sentence. This is not the behavior of a dangerous individual but rather of a citizen attempting, however clumsily, to exercise his rights. This is a far cry from a "danger to the community", and the government's attempt to equate the two is both unfounded and could be seen as retaliation for exercising the constitutional right of access to the courts. Such an attack on average citizens also provides a basis for distrust in government and its process. Furthermore, his *alleged* disciplinary infractions --possessing drugs or alcohol, destroying property, and possessing unauthorized tools-- if true, are not indicative of a propensity for the type of digital, non-physical, sexual crime for which he was convicted. Moreover, while ignorance of the law is not a defense *to prosecution*, it is highly relevant to any purported *future* danger to the community. The court should discount that ignorance of the law set a trap that knowledge now prevents the violation of[10]. Citizens are presumed to follow the law.

---

8   Cf   USSG 1B1.13(e) "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment"

9   It is highly relevant that the term "frivolous" also encompasses foreclosed arguments and premature filings.

10   See generally, the "Lambert Due Process Exception";   Dkt #299 @ 77-79

It is also highly relevant that at least *two* neutral third-partys have already given a personal assessment; Dr Witherspoon's report on danger, located on the record at Dkt #24 found there to be an exceptionally low risk. Similarly, the Department of Justice's own P.A.T.T.E.R.N. tool also assesses Fredrickson as a "low" risk.

Finally, if this court were to identify and establish a concrete danger, this court is statutorily authorized to "impose a term of probation or supervised release with or without _conditions_ that does not exceed the unserved portion of the original term of imprisonment" 18 USC §3582(c)(1)(A). The court can tailor these conditions as the interests of justice require.

The most difficult and emotional aspect of this case is the victim's deeply felt pain, as expressed in her victim impact statement. The Government's use of her statement is an emotionally powerful plea to the Court. Her pain is valid, and her desire for the legal process to end is understandable. On this point, Fredrickson has neither made, nor attempted, any kind of contact --but the government has. Rather than let her heal in peace, the government desires a victim with fresh wounds to weaponize and use to its desired ends. She is not a pawn, she is a human being with emotions. The government's contact is disingenuous, it is not to help. The victim in this case has expressed a strong desire to move on, and the government should let her. It is not Fredrickson who has failed to leave her alone, it is the government. The court should strongly caution the government against further contact.

Fredrickson urges this court to balance the victim's right to peace with the defendant's right to pursue all legal remedies available to him under the law. A defendant's motion, while procedurally burdensome, is not a new act of harassment in the criminal sense. The pain the victim feels is a result of the legal process itself, not a new danger posed by the defendant. Denying a meritorious motion simply to provide emotional closure to the victim would be a perversion of the legal process and an abuse of judicial discretion. The Court must apply the law as it is written, weighing the defendant's new, life-threatening circumstances against the valid but distinct considerations of victim impact that §3582, perhaps by an intentional Congressional choice, does not account for.

## IV. Conclusion

Fredrickson has met his burden under the law. His diagnosis with latent tuberculosis proves that the correctional facility is "affected" by an ongoing infectious disease outbreak. His prior COVID-19 infection, combined with the extreme transmissibility of measles, places him at a unique and extraordinary risk of severe medical complications or death. The BOP's demonstrated inability to mitigate this risk in a timely and adequate manner, even with its own guidelines, renders continued incarceration a life-threatening reality.

The court found that the original sentence was just, but the circumstances of his incarceration have fundamentally and irrevocably changed. Granting this motion is not an act of leniency but a necessary and legally authorized response to a new and compelling risk. For the reasons stated above, Fredrickson respectfully requests that this Honorable Court grant his motion for a sentence reduction or a substitution with supervised release accompanied by any set of conditions that are necessary in the interest of justice.

Respectfully submitted,

/s/ Tim Fredrickson

/S/ Tim Fm

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 17-40032 |
| | ) |
| TIMOTHY FREDRICKSON, | ) |
| | ) |
| | ) |
| Defendant. | ) |

### ORDER AND OPINION

On June 9, 2025, *pro se* Defendant Timothy Fredrickson filed his third Motion for Compassionate Release. ECF No. 319. The Government filed a timely response in opposition. ECF No. 321. With the Motion fully briefed, the Court now address whether compassionate release is warranted.

### I.    BACKGROUND

On January 22, 2020, a jury found Defendant guilty of Sexual Exploitation of a Child in violation of 18 U.S.C. §§ 2251(a) and (e). ECF No. 154. The Court sentenced him to 200 months' imprisonment followed by 10 years of supervised release. ECF No. 183. Defendant appealed, arguing that the conduct underlying the offense is protected expressive speech under the First Amendment. ECF No. 188. The Seventh Circuit affirmed the district court's judgment and denied Defendant's petition for rehearing. *United States v. Fredrickson*, 996 F.3d 821 (7th Cir. 2021); ECF No. 202. As of the date of this Order, Defendant's projected release date from the Bureau of Prisons ("BOP") is September 15, 2031.https://www.bop.gov/inmateloc/ (lasted visited Oct. 1, 2025).

On January 18, 2022, Defendant filed his First Motion for Compassionate Release. ECF No. 203. The Court denied this Motion, finding the disruption from COVID-19 nearly two years

1

into the pandemic did not warrant Defendant's release. ECF No. 214. The Court further observed that Defendant refused the vaccine and did not have any medical conditions that increase his risk of experiencing severe COVID symptoms. *Id.* at 5. Defendant appealed and the Seventh Circuit affirmed this Court's denial of compassionate release. ECF No. 248.

Defendant filed his second Motion for Compassionate Release on June 27, 2022, complaining the prison was not doing enough to prevent the spread of COVID. ECF No. 224. He further asserted that he was exercising his constitutional rights to Free Exercise of Religion and Free Speech to be remain unvaccinated, and that it is unfair to penalize him for doing so. *Id.* at 3. He also complained about the restrictions placed upon him because he has been categorized as having committed a crime of violence. The Court dismissed this Second Motion for Compassionate Release finding that Defendant failed to exhaust his administrative remedies. *See* ECF No. 232.

Defendant now seeks compassionate release for a third time based on his medical circumstances. Specifically, he contends release is appropriate because: (1) his correctional facility is "affected by [t]uberculosis and at imminent risk of being affected by [m]easles;" (2) if exposed to either disease, his medical history makes him more vulnerable to death and/or severe medical complications; and (3) his facility's current protocol regarding the spread of infectious diseases does not constitute a timely mitigation strategy. ECF No. 319 at 5–6. In response, the Government contends that Defendant has not met his burden of showing that his present circumstances amount to an extraordinary and compelling reason for his release. ECF No. 321. Even if so, the Government urges the Court to deny the Motion because Defendant poses a danger to society under the 18 U.S.C. § 3553(a). *See id.*

## II.    LEGAL STANDARD

Prior to filing a motion for compassionate release, a prisoner must first "present his request for compassionate release to the warden and exhaust administrative appeals." *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021) (citing 18 U.S.C. § 3582(c)(1)(A)). Exhaustion of administrative remedies is a mandatory prerequisite for a judge to grant a motion for compassionate release. *Id.* Here, the parties do not seem to dispute that Defendant has exhausted his administrative remedies. *See* ECF No. 319 at 12-19; ECF No. 321.

If a prisoner has exhausted his administrative remedies, then "the prisoner must identify an 'extraordinary and compelling' reason warranting a sentence reduction", *United States v. Thacker*, 4 F.4th 569, 576 (7th Cir. 2021), and that a reduction is consistent with applicable policy statements issued by the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A)(i). In 2023, the Sentencing Commission promulgated amendments to the sentencing guidelines, including § 1B1.13's policy statement. The amendments to § 1B1.13 rendered the policy statement applicable to defendant-filed motions.

"[T]he movant bears the burden of establishing extraordinary and compelling reasons that warrant a sentence reduction." *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021) (quotation marks omitted). When determining whether a prisoner has raised an extraordinary and compelling reason, a court should consider all the reasons raised "[i]ndividually and collectively. " *United States v. Vaughn*, 62 F.4th 1071, 1073 (7th Cir. 2023). Even if a reason on its own is "insufficient to meet the threshold," the collective effect of all the reasons raised may be extraordinary and compelling. *Id.*

If the defendant establishes an extraordinary and compelling reason exists, only then will courts next consider whether reduction is appropriate under the sentencing factors set forth in 18 U.S.C. § 3553(a). These factors include the nature and circumstances of the offense as well as the

3

history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Further, § 3553(a) directs

courts to consider the need for the sentence to (1) reflect the seriousness of the offense, promote

respect for the law, and provide just punishment, (2) adequately deter future criminal conduct, (3)

protect the public, and (4) rehabilitate the defendant. 18 U.S.C. § 3553(a)(2).

### III.    DISCUSSION

Defendant argues that he can establish extraordinary and compelling circumstances due to

his medical condition under U.S.S.G. § 1B1.13(b)(1). That section provides in relevant part:

> (i) the defendant is housed at a correctional facility affected or at imminent risk of
> being infected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing
> public health emergency declared by the appropriate federal, state, or local
> authority;

> (ii) due to personal health risk factors and custodial status, the defendant is at
> increased risk of suffering severe medical complications or death as a result of
> exposure to the ongoing outbreak of infectious disease or the ongoing public health
> emergency described in clause (i); and

> (iii) such risk cannot be adequately mitigated in a timely manner.

U.S.S.G. § 1B1.13(b)(1)(D).

Under the first factor of § 1B1.13(b)(1)(D), Defendant contends that his correctional

facility, Federal Correctional Institution Seagoville ("FCI Seagoville"), "is current affected by

tuberculosis and/or at imminent risk of being affected by measles." ECF No. 319 at 12. Beginning

with tuberculosis, Defendant does not allege that there are any cases at FCI Seagoville other than

his own. This does not constitute an ongoing outbreak. *See United States v. Tolbert*, No. 19-CR-

236-2-JPS-JPS, 2024 WL 4949049 (E.D. Wis. Dec. 3, 2024), *aff'd,* No. 24-3321, 2025 WL

2438201 (7th Cir. June 27, 2025) (finding that two cases of COVID-19 did not constitute an

"ongoing outbreak."). Further, Defendant's own diagnosis does not lend to the conclusion that an

outbreak is imminent. Defendant has latent tuberculosis which cannot be spread to others and can

"lay dormant in the body for years." ECF No. 321 at 13 (quoting Centers for Disease Control

4

("CDC"), https://www.cdc.gov/tb/about/inactive-tuberculosis.html). Thus, Defendant cannot, on the diagnosis alone, show that he is housed at a correctional facility affected or at imminent risk of being infected by an ongoing outbreak of tuberculosis. *See* § 1B1.13(b)(1)(D)(i).

Regarding measles, Defendant only provides statistics regarding the infection rates across the state of Texas and the country, generally. However, on August 18, 2025, the Texas Department of State Health and Human Services reported the end of the measles outbreak. Texas Health and Human Services, https://www.dshds.texas.gov/news-alerts/texas-announces-end-west-texas-measles-outbreak, (last visited Sept. 29, 2025). Further, Defendant provides no evidence that his fellow inmates are not vaccinated or otherwise susceptible to contracting and spreading measles. *See Tolbert*, No. 19-CR-236-2-JPS-JPS, 2024 WL 4949049, at *4 (noting that there was no imminent risk of outbreak where two-thirds of the inmates were vaccinated against the disease).

Regarding the second factor, Defendant also fails to demonstrate that his personal health risk factors put him at a heightened risk of death or severe medical complications. Defendant's recent medical records show that his lungs are clear with no evidence of an active tuberculosis infection.[1] Though latent tuberculosis could develop into active tuberculosis, Defendant does not provide any evidence that such a development is likely. Even if it were, Defendant does not explain why such a condition would not be remedied through treatment and medication, such as the complete course of treatment he received in June 2025. ECF No. 321-2 at 1, 8.

Similarly, Defendant fails to demonstrate how contracting measles would put him at a heightened risk of medical complications or death. Nowhere among his conclusory statements does Defendant point to a personal medical factor which would render conventional measles

---

[1] In response, Defendant states that "extensive medical literature" contradicts this statement. ECF No. 324 at 4. Defendant then attempts to cite to "long COVID" and its symptoms. However, absent from this counterargument is any evidence that Defendant had "long COVID' or its symptoms. *See id.*

treatment ineffective. Nor does Defendant address the Government's contention that Defendant is likely vaccinated and thus, at a reduced risk of contracting or suffering adverse health effects from a measles diagnosis.

Finally, Defendant does not address, let alone satisfy, the final factor: whether the risk to the Defendant could be adequately mitigate in a timely manner. As the Government highlights, if the Defendant were to contract tuberculosis or measles any risk to his health would be addressed through medical treatment.[2] Further, regarding the risk from measles, any risk to the Defendant would be timely mitigated through the vaccine, assuming he has not already received it.

For these reasons, the Court finds that Defendant has failed to establish his burden of showing an extraordinary and compelling reason for release. Moreover, even assuming Defendant could establish eligibility for a reduced sentence, this Court finds the balance of the § 3553(a) factors weigh against a sentence reduction. Whatever mitigating factors existed in this case, such as Defendant's criminal history, the Court took into consideration at sentencing when Defendant was given a sentence slightly below the Guideline range. *See* ECF No. 185. Defendant has not provided any basis for the Court to reconsider its calculation of an appropriate sentence based on the § 3553(a) sentencing factors. Rather, the sentence imposed in this case reflects the seriousness of the offense, promotes respect for the law, is a just punishment and adequate deterrence, and is necessary to protect the public from further crimes. *See* 18 U.S.C. § 3553(a)(2)(A)-(D).

---

[2] In response to this argument, Defendant states that this counterargument "misses the issue" and the focus is not on the availability of treatment but on the whether the facility itself is safe given Defendant's "compounding vulnerabilities." ECF No. 324 at 5. However, case law from this circuit compels the alternative conclusion. *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) (finding COVID-19 was not a basis for release where effective vaccine was available to the inmate); *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021) (same). Further, as discussed above, Defendant has failed to show alleged "compounding vulnerabilities" and how they put him at a heightened risk.

## IV.     CONCLUSION

For the reasons set forth above, Defendant's Motion for Compassionate Release [319] is DENIED. Defendant has failed to establish an extraordinary and compelling reason consistent with applicable policy statements which would warrant a sentence reduction, and the balance of § 3553(a) factors and the interests of justice weigh against a sentence reduction.

ENTERED this 1st day of October 2025.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge